### WALLACE v. WEINSTEIN.

#### In re WALLACE AUTOMOBILE CO.

(Circuit Court of Appeals, Third Circuit. April 30, 1919.)

No. 2410.

1. CORPORATIONS ⬀228—ASSESSMENT OF STOCKHOLDERS—UNPAID STOCK.
    Capital stock issued as full paid by a Delaware corporation on a contract for purchase of real estate, which was never carried out by full payment or conveyance of the property, was not issued on a conditional subscription, and was not only not full paid, but wholly without consideration, and assessable in the hands of the holder under the law of Delaware for the benefit of creditors.

2. CORPORATIONS ⬀232(3)—CAPITAL STOCK—PROSPECTIVE PROFITS.
    Under the law of Delaware, a corporation cannot lawfully capitalize prospective profits.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; John B. McPherson, Judge.

In the matter of the Wallace Automobile Company, bankrupt. Jacob J. Weinstein, trustee in bankruptcy, petitioned for leave to assess

its corporate stock in the amount same was not fully paid. From an order of the District Court, Robert Wallace appeals. Affirmed.

John Arthur Brown and Henry P. Brown, both of Philadelphia, Pa., for appellant.

Joseph Sternberger and Fox & Rothschild, all of Philadelphia, Pa., (George P. Rich, of Philadelphia, Pa., of counsel), for appellee.

Before BUFFINGTON and WOOLLEY, Circuit Judges, and HAIGHT, District Judge.

WOOLLEY, Circuit Judge. The Trustee of the bankrupt corporation petitioned the Referee for leave to assess the stock of the corporation in the amount it had not been paid for, or in such lesser amount as would meet the obligations of the estate. Allowance of this petition turned primarily on the question whether the stock was full paid. It was ultimately decided by the Referee on a finding that the stock had been issued upon a conditional subscription, that the condition had not been performed by the corporation, and that, in consequence, the stock was not assessable. On review before McPherson, Circuit Judge, sitting in the District Court, the Referee's order was reversed and an assessment was directed to be made on certain shares held by Robert Wallace, the appellant, at a rate to be determined during the case. This appeal is from the order of the District Court.

The relevant facts are these: Wallace engaged in the automobile business through the medium of a Delaware corporation. He obtained a charter in July, 1912, and complied with the formalities of corporate organization by paying $1,000 in cash for the initial issue of 100 shares of stock. He named the directors and had himself elected treasurer and general manager.

Wallace owned two properties in Philadelphia in which he proposed the corporation should conduct its business. On August 8, 1912, he caused a contract to be made between himself and the corporation, in which he agreed to sell and the corporation agreed to purchase these properties for the consideration of $130,000—$30,000 in cash and $100,000 in the common stock of the corporation. No time was named for the issue and delivery of the stock; October 1, 1913, was the date set for the payment of the cash. It was agreed further, that the corporation should pay taxes, water rent, insurance, and interest on a mortgage, as rent until payment in full of the purchase price; repairs and improvements to be made and paid for by the corporation. Thereupon the corporation, in part performance of its undertaking of purchase, issued to Wallace 10,000 shares of its stock at the par value of $10 a share, as full paid stock. It then embarked in business, in the prosecution of which it obtained credits and incurred debts.

The contract of purchase and the stock issue were characterized by informalities not unusual in transactions of this kind. The minutes of the corporation record little of what was done or of what was intended to be done, and are silent with respect to any exercise of judgment by the directors as to the value of the property for which the corporation proposed to issue its stock and pay money. Both

Wallace and the corporation, however, regarded the properties so purchased as the consideration for the stock, and treated the stock as full paid when issued by the corporation and accepted by Wallace, though Wallace gave nothing for it and the corporation received nothing in return. On January 1, 1913, being a date many months after the corporation had issued its $100,000 of stock and had delivered it to Wallace in payment of the stock consideration for the properties, and being a date also many months prior to that named for the payment of the cash consideration of $30,000, Wallace and the corporation made another contract dealing with one of the two properties covered by the first contract. Whether it was intended that the second contract should abrogate the first, in whole or in part, does not appear, for it contained no reference to the first contract or to the previously proposed use of the same property as part consideration for the $100,000 stock issue.

By the second contract, Wallace leased one of his two properties to the corporation for a short term, in consideration of a nominal rent, and of the payment by the corporation of taxes, water rent and interest, and the making of improvements and repairs. Wallace then promised to sell to the corporation the one property named in the contract for $30,000 in cash, on a future date, notwithstanding he had already promised in the first contract to sell this and the other property for the same cash consideration, plus $100,000 of stock.

Just what Wallace intended by this transaction, we can not imagine. What is its legal effect, considered with reference to the proposed use of the same property as part consideration for the stock issue under the first contract, and its apparent withdrawal from that use under the second, we are not informed.

It appears that in his plan of corporate organization, Wallace intended to have 5,000 shares (or $50,000) of the stock issued directly to the corporation as full paid stock to be used as bonus to induce purchases of preferred stock, which was to be issued and sold later. This plan miscarried when the whole $100,000 of stock was issued to him. To carry out his original purpose, Wallace handed back to the corporation 5,000 shares and received in return a certificate for the same number of shares, made in his name as Trustee. His holding of treasury stock was thereafter reduced from time to time, as it was drawn on for use as bonus stock, until, at the last, he held but 3,925 shares.

On October 10, 1913, Wallace and the corporation entered into a third contract, whereby they expressly undertook to abrogate the first and second contracts for the sale of the properties, and to annul the transactions performed under them in so far as they related to the issue by the corporation and the acceptance by Wallace of the $100,000 of stock; being careful, however, to preserve to Wallace all benefits of taxes and interest paid and improvements made on the properties. The abrogation of the stock transactions was intended to be effected by Wallace surrendering to the corporation the 5,000 shares of stock retained by him personally, less the 100 shares paid for in cash, and so much of the treasury stock which then remained in his name as Trustee, amounting to 3,925 shares. The 5,000 shares

which Wallace thus surrenderd were cancelled, but the 3,925 shares, intended likewise to be surrendered, remained uncancelled and on the books.

At the time of this transaction, the corporation was insolvent, and a month later, that is, on November 6, 1913, it filed a voluntary petition in bankruptcy. The complete insolvency of the corporation at that time was shown later by the administration of the bankrupt estate, wherein the moneys realized from assets amounted to $2,900 and the scheduled debts and costs of administration exceeded $25,000.

Prior to bankruptcy, the corporation had paid $492.00 in taxes and water rents; $1,750.00 interest on the mortgage; and had expended upwards of $12,000 in improvements upon the property.

The two important facts occurring before bankruptcy are these: Wallace never conveyed the property to the corporation; the corporation made part payment on its contract of purchase by issuing and delivering to Wallace $100,000 of its stock as full paid. Wallace held both the property and the stock.

The two facts outstanding at the time of bankruptcy are these: The corporation had not paid Wallace the $30,000 cash part of the purchase price for the properties; Wallace still held his properties and so much of the stock as he had not succeeded in getting cancelled.

Wallace justifies holding the properties because the corporation did not make its cash payment of $30,000, and avoids liability for assessment on his stockholding upon the ground that the stock was issued to him under a conditional subscription and that the condition (the payment of the $30,000 cash consideration) had not been performed.

Preliminarily to deciding the question of assessment, we dispose of the contract of cancellation as void. In doing this, no comment is necessary, except to say, that the parties seem to regard the 5,000 shares which Wallace held as his own, and the 1,075 shares otherwise held and in part distributed as bonus, to be wholly out of the case, leaving in dispute only the 3,925 shares which stood in Wallace's name as Trustee at the time of bankruptcy. As all parties, both in the court below and in this court, restricted the controversy to this aspect of the case, as also did the trial court whose order is now under review, we are not disposed to go beyond it on this appeal. The question, therefore, is, whether the 3,925 shares of stock standing in the name of Wallace as Trustee at the time of bankruptcy are liable to assessment in his hands, as holder.

[1] We find this stock assessable under any aspect of the case.

We agree with the learned trial judge that "Wallace's subscription was not conditional." Wallace made a contract for the outright sale of his properties to the corporation, to be paid for by stock and money. Payment by the corporation of stock and money for the properties was not a "condition" of the subscription, as that term is used in the law of conditional subscriptions. Cook on Corporations, section 77–89. The corporation's promise to pay Wallace for his properties was the "consideration" for Wallace's promise to convey the properties to the corporation. Each promise was absolute; neither was affected by

conditions. Of course, as between the parties, neither promise was enforceable by one against the other without performance or a tender of performance by the moving party of his own undertaking. But we have here no contest between parties to enforce a contract; we have rather a situation where the corporation performed a part of its undertaking by issuing its stock and making part payment of the consideration, and where Wallace, by performing no part of his undertaking, made the issue of the stock as full paid impossible. While Wallace was not bound to convey the property to the corporation until the corporation had paid him the full consideration, and while the corporation was not required to make the stock payment to Wallace until it was ready to make the cash payment also, thereby making possible the issue of stock as full paid in return for property received, the facts are, the corporation made the stock payment and Wallace accepted it, and the transaction, instead of being a mistake or an inadvertence, was part of the plan for financing the corporation, which Wallace had carefully thought out. This is shown by Wallace's testimony, that, under the plan, $50,000 was intended to be issued as full paid stock—somehow or other—directly to the corporation to be used later as treasury stock in promoting the sale of preferred stock. and it is shown also by the fact, that, when Wallace discovered that a "mistake" in the plan had been made by delivering all of the stock to him, he split the stock, had one half put in his name as trustee and thereafter held and used it in promoting the sale of preferred stock, and retained the other half for himself. · This was Wallace's way of rectifying the mistake. With the stock thus issued, held out and used, we are concerned not with the rights of Wallace and the corporation as parties to the stock transaction, but with the rights of creditors which have intervened. As Wallace retained both properties for which the stock was represented to be issued as full paid, and as the corporation on issuing the stock received nothing in return, it is very certain that the stock, though described as full paid, was not paid for at all. The effect of this transaction on the capital resources of the corporation is obvious. The effect upon the corporation's creditors is equally obvious.

All doubts as to the character and basis of liability to creditors of one who has thus acquired and thus holds stock of a corporation, are, under the law of Delaware, settled beyond dispute by the case of John W. Cooney Company v. Arlington Hotel Company (Del. Ch.) 101 Atl. 879, decided by the Chancellor and affirmed by the Supreme Court of that state, Du Pont v. Ball, 106 Atl. 39; following like decisions on a similar law by the courts of New Jersey in See v. Heppenheimer, Untermeyer et al., 69 N. J. Eq. 36, 61 Atl. 843; Holcombe v. Trenton White City Co., 80 N. J. Eq. 122, 82 Atl. 618, affirmed by the Court of Errors and Appeals, 82 N. J. Eq. 364, 91 Atl. 1069. In these cases, corporate stock issued, outstanding and not paid for is regarded as a trust fund for the benefit of creditors. The courts of these jurisdictions treat this doctrine as a hard and fast rule imbedded in its law, never to be relaxed. But they go further and hold that stockholders' liability to creditors in such case no longer depends on the trust fund theory, but is a statutory liability.

In the case of John W. Cooney Company v. Arlington Hotel Company, supra, Chancellor Curtis, sitting in the trial court, and Chief Justice Pennewill, speaking for the Supreme Court on appeal, have so elaborately discussed the assessment of corporate stock and the liability of stockholders for assessment under the constitution and statute of the State of Delaware, that repetition of that discussion would add nothing to the decision there made. There is, however, one statement of the Chief Justice, which is peculiarly applicable to the question in this case. It is as follows:

"And even though stock issued without consideration could be held to be void under our constitutional provision, and could be cancelled by the corporation or upon the application of bona fide stockholders, it does not follow that the acceptor of such stock could claim immunity from assessment. Certainly a stockholder cannot escape such assessment if he has held himself out, or permitted himself tc be held out, as the owner of the stock; and much less could he escape if he participated in the unlawful issue or acquiesced therein."

We see nothing in the case that avoids assessment of the stock of the bankrupt corporation or that absolves Wallace from his liability to meet an assessment on stock standing in his name at the time of bankruptcy to an amount equal to its face or such lesser amount as will discharge the obligations of the bankrupt estate.

Having reached this decision, we would not discuss the other aspects of the case except for the attention given them in the testimony and at the arguments, and for the insistence with which they were urged. The first had to do with the value of the properties intended for use as the basis of the stock issue. Wallace contends that the properties were in truth equal in value to the face of the stock, and that, in consequence, the stock when issued for the properties was in fact full paid. As the properties were never conveyed to the corporation and as stock could not be issued against property which the corporation had not acquired, we are at a loss to know the pertinency of this contention. But, assuming there is in the case a basis for this contention, Wallace proved by his own testimony that the stock is not full paid. While he proposed by his first contract to sell the properties to the corporation for the total consideration of $130,000, the highest value he put upon them was $75,000, which, after deducting encumbrances, left an equity of but $12,000. As to the real value of the property and its value for the purpose of capitalization, Wallace made this naive admission:

"There was a certain amount of stock given to you that you don't always pay for. Take $30,000 from $75,000 and it leaves $45,000, and deducting your mortgages of $33,000 leaves $12,000 for which the stock was given."

On this testimony, it is quite impossible to hold that the $100,000 of stock was full paid.

[2] The next contention is, that the $100,000 of stock was paid for—in part, at least—by Wallace's transfer to the corporation of certain contracts of agency with automobile manufacturers, alleged to be worth $50,000. If such contracts were transferred to the corporation for its stock—even at the value, subsequently placed upon them—then the stock at the best was only half paid for. But there

is nothing contemporaneous with the stock transaction which indicates, that the agency contracts were assigned to the corporation in part consideration for the stock. But if they were so assigned, the contracts—which later proved valueless—if property in any sense—were not property of a kind for which stock can be issued. They contained nothing more substantial than a promise of profits. Contemplated profits cannot be a basis of capitalization of a corporation under the Delaware law, for neither stockholders nor directors have any right to make a present capitalization of prospective profits. See v. Heppenheimer, Untermeyer et al., supra; Holcombe v. Trenton White City Co., supra; John W. Cooney Company v. Arlington Hotel Company, supra. The agency contracts cannot be regarded as consideration for the stock in any amount.

Any question of Wallace's liability as a stockholder for assessment on unpaid stock, though standing in his name as Trustee, and any question of the right of the Trustee in bankruptcy to enforce his liability for the benefit of creditors, by analogy to a like right of a receiver of an insolvent corporation, are set at rest under the laws of Delaware by the decisions in John W. Cooney Company v. Arlington Hotel Company, supra. The case cited is distinguished from Courtney v. Georger, 228 Fed. 859, 143 C. C. A. 257, by the interpretation which the courts of Delaware have given the Delaware statute. See also Alling v. Wenzel, 133 Ill. 264, 24 N. E. 551; Allibone v. Hager, 46 Pa. 48; 1 Cyc. 714.

The order of the District Court is affirmed.