### In re PIPE LINE OIL CO.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1923.)

No. 3817.

1. **Corporations ⬥216—Stockholders' liability governed by law of state of incorporation.**

The liability of stockholders of corporation arises under and is determined by the law of the state where the corporation was organized.

2. **Bankruptcy ⬥145(2)—Right to sue on stockholders' liability held in trustee.**

Under General Corporation Law Del. § 14, right of action to enforce stockholders' liability *held* to vest in trustee of bankrupt corporation.

3. **Bankruptcy ⬥303(3)—Proof held not to show stockholders' fraud.**

That promoters of corporation transferred to the corporation oil leases and a contract with another oil company for $150,000 of stock, which directors accepted, and the promoters then donated to the company $75,000 of stock to be given as a bonus with 7 per cent. notes to be sold to raise working capital, *held* not to show fraud, in view of General Corporation Law, Del. § 14, providing that directors' judgment as to value of property taken for stock shall be conclusive.

4. **Bankruptcy ⬥250(1)—Prima facie case necessary for assessment against stockholders.**

When a Delaware corporation becomes bankrupt, the bankruptcy court should be satisfied that there is a prima facie case of actual fraud in the transaction before assessing stockholders for liability on nominally fully paid stock issued for property.

Petition to Revise an Order of the District Court of the United States for the Western District of Kentucky; Walter Evans, Judge.

In the matter of Pipe Line Oil Company, bankrupt. On petition by trustee in bankruptcy to review an order. Order modified.

The trustee in bankruptcy seeks review of the order of the District Court, which order modified and in a large measure vacated the order of the referee levying an assessment of 100 per cent. upon those stockholders of the bankrupt corporation who were said not to have paid for their stock. The trustee filed with the referee his petition, alleging that certain named stockholders held "bonus stock," and that full payment upon it was required in order to meet the bankrupt's debts. Many of the stockholders were not served within the jurisdiction. Several who were served, and some who were not, appeared specially to protest against the jurisdiction of the court to levy any assessment which would be binding in a suit brought to collect it; others appeared generally, possibly thereby consenting to try out before the referee all the allegations of the petition. The situation was much complicated by the fact that the greater part of the corporate debts was owing to these same bonus stockholders; creditors who were corporate strangers held only $18,000 of debts out of a total of $71,000. The amount of alleged bonus stock sought to be reached in this proceeding was $75,000. The referee concluded that the stock was unpaid and that an assessment should be made for the benefit of all creditors, including the stockholders to be assessed. His order was in such form that, in direct suits to be brought for recovery of the assessment, it would doubtless be claimed that some of the vital questions were adjudicated beyond reconsideration. The opinion and order of the District Court expressed disapproval of this finality, and remanded the matter to the referee, with directions to proceed also against other stockholders, and practically to begin over again. Though this order may be susceptible of some conclusions adverse to the stockholders, they have not sought review, perhaps because it was not sufficiently final.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

W. W. Watts, of Louisville, Ky. (Gifford & Steinfeld, of Louisville, Ky., on the brief), for petitioner.

Allen P. Dodd, Lawrence S. Leopold, and Percy N. Booth, all of Louisville, Ky. (M. H. Thatcher, Walter E. Huffaker, Walter S. Lapp, C. B. Seymour, and Booth, McDowell & Conner, all of Louisville, Ky., on the brief), for respondents.

Before KNAPPEN, DENISON, and DONAHUE, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). [1] Several questions have been argued which may eventually become important, which are more or less imperfectly presented by the record and which lead into complications. We prefer to pass these by and dispose of the matter for the present upon an underlying and simpler ground. This requires a further statement of the situation. The corporation was organized under the Delaware law. The liability of stockholders therefore arises under and is determined by that law. In re Associated Oil Co., 289 Fed. 693, opinion this day filed. The controlling statute is section 14 [1] of the General Corporation Law of that state.

The promoters of this corporation were apparently Messrs. Smith, Hall, and Butler. Messrs. Smith and Hall held oil leases upon 170 acres of land in one of the Kentucky oil regions, and also claimed to have a certain contract with another oil company. The corporation having been formally organized by incorporators, who, we assume, were under the control of the promoters and without substantial interest, Messrs. Hall and Smith proposed to the directors to transfer to the corporation these oil leases and this contract in exchange for $150,000 of the full-paid nonassessable capital stock. The stockholders recommended to the board of directors that this offer be accepted and full-paid stock be issued therefor, if, in their judgment, the property rights mentioned were of the value specified. The board of directors, then composed of the three promoters, voted to accept the proposition, and the stock was issued accordingly. They also decided to sell $75,000 of 7 per cent. notes, apparently in order to raise working capital. Thereupon Messrs. Hall and Smith further offered to donate to the company treasury $75,000 of the stock that had been issued, in order that it might be given as a bonus along with the notes to be sold, and this offer was accepted. Accordingly the certificate for $75,000 which stood in Smith's name was surrendered and a certificate for that amount issued to the company, while the certificate for $75,000 in Hall's name was surrendered and reissued in three equal parts to Smith, Hall and

[1] "Sec. 14, *Issuance of Stock for Labor or Real or Personal Property.* Subscriptions to, or purchase of, the capital stock of any corporation organized or to be organized under any law of this state may be paid for, wholly or partly, by cash, by labor done, by personal property or by real property or leases thereof; and the stock so issued shall be declared and taken to be full paid stock and not liable to any further call, nor shall the holder thereof be liable for any further payments under the provisions of this chapter. And in the absence of actual fraud in the transaction, the judgment of the directors as to the value of such labor, property, real estate or leases, shall be conclusive." Rev. Code 1915, § 1928.

Butler; $62,000 of the notes, along with an equal amount of this stock in the treasury, were sold, mainly in small amounts to a large number of purchasers. The money was paid into the treasury, less 25 per cent. retained or expended by the promoters as commissions and expenses for selling the notes. It seems to be assumed by all of the parties that this capital, together with additional capital borrowed, was used in exploiting the proposed business, and that this exploitation was continued for some months, but finally proved commercially unsuccessful.

No proof whatever was taken as to the actual value or the reasonably estimated value of this property, at the time of its use as payment in full for the stock. From the mere facts of the immediate return to the corporation treasury of one-half of the stock issued and the simultaneous adoption of the plan to use this $75,000 of stock to promote the sale of the notes, the referee drew the inference, practically as one of law and which he thought could not be escaped, that the property was not worth more than $75,000, and that so much of the valuation placed on the property as had been applied to pay up the stock, which was returned to the treasury, was a fraudulent overvaluation, and that this stock had always been wholly unpaid. Upon the rightfulness of that conclusion, the referee's report must stand or fall.

[2] The first question is whether the trustee in bankruptcy has the' right to enforce whatever liability there may be. This question we discuss more fully in the accompanying Associated Oil Company opinion. Here we confine ourselves to the rule in Delaware on this subject. To establish their claim that the Delaware rule is the same as the Ohio rule which we applied in Kiskadden v. Steinle, 203 Fed. 375, 121 C. C. A. 559, counsel rely upon Cooney Co. v. Arlington Co., in which case the Chancellor's opinion is reported in 11 Del. Ch. 286, 101 Atl. 879, and the opinion of the Supreme Court (sub nom. Du Pont v. Ball) in 11 Del. Ch. 430, 106 Atl. 39, 7 A. L. R. 955. As to any matter excepting one of procedure, that case would be so far distinguishable from this one as not to be necessarily controlling authority, and just what force it should carry it is unnecessary to say. It there appeared that $3,-000,000 of common stock was issued in exchange for the promotion work, which was to be done mostly after organization. The court points out that there was no pretense of exchanging any property for stock, and that the statute permits stock to be issued for work only when it has been "done," and not for work "to be done." It then holds that the situation was the same as if the stock had been issued as fully paid in the absence of any payment whatever; that the agreement not to require full payment was void, because ultra vires; and that the case stood as if upon an unpaid subscription. From this premise, the various conclusions of the court, including the one that a receiver could collect, naturally followed.

Where there is an acceptance of actual property at an agreed valuation, thus calling into action the last clause of section 14, which says that such a transaction shall not be impeached save for actual fraud, different conclusions are obviously involved, as pointed out in our other opinion, and the question of who may be entitled to be of the class defrauded and other analogous questions depend upon the effect

of. this clause, which was so far from controlling in Cooney v. Arlington that it is not mentioned in the opinion of either. court. However, we are inclined to think that the Delaware procedure, intended to be declared and established by these opinions, is broad enough to include all actions against those claimed to be liable as stockholders on account of the par value of the capital stock. The Delaware courts did not make any exceptions to their somewhat general language, and the Circuit Court of Appeals for the circuit including Delaware—a court familiar with the Delaware law—has thought that a trustee in bankruptcy has the right of action, though this, too, was in a case where there had been no transfer of property at an agreed valuation. Wallace v. Weinstein, 257 Fed. 625, 168 C. C. A. 575. Upon the whole, we conclude that a right of action of this kind, when arising under the Delaware law, as well as when under the Ohio or New Jersey law, vests in the trustee in bankruptcy.

[3] Coming to consider the effect of the declaration that the judgment of the directors as to the value of the property shall be conclusive in the absence of actual fraud, we are unable to agree with the referee's view. The burden is clearly on the trustee to make out such fraud. The record does not explain how it happened that no proofs were taken on this issue beyond the corporate records themselves. Some things in the referee's opinion indicate that he thought these so conclusive to establish fraud that nothing could be received to dispute it, or it may have been thought by the trustee that they made a prima facie case of fraud, and the stockholders, judging otherwise, may not have thought necessary to introduce counter proofs. However that may be, we deem the record not sufficient to raise this presumption of fraud, either as of law or as of fact. It is not necessary, on the one hand, to consider the case of an agreed valuation of property of stable, permanent value, nor yet of extremely evanescent rights, like good will, upon the other hand. What were here involved were oil leases and (it is said) a contract for the purchase and transportation of the output of a prospective large producer. Such property is notoriously of speculative value. It may have no fixed, or market, value, and yet be truly valuable. Indeed, we do not understand it to be argued that, if the directors had fixed the value at $150,000 and issued all the stock therefor as fully paid, and done nothing else, there would be any presumption of fraud to be drawn merely from the fact that the enterprise failed.

The proof of fraud is said to be found in the practically simultaneous turning back of one-half of the stock for the avowed purpose of being used to promote the sale of notes for working capital. This develops a peculiar characteristic of a mining prospect, strikingly true of an undeveloped oil lease, and perfectly familiar to all. Its value depends upon the existence of available capital for development. No one would doubt that it would often be reasonable for the owner of such a prospect to give one-half of it as a bonus to any one who would lend the perhaps large amount of capital necessary for exploitation. It might well be, it being a question of fact, that $75,000 would be a high price for oil leases helpless for lack of capital, and $150,000 would be a reasonable price for the same leases if and when the necessary

capital could be borrowed. To carry out this theory in connection with a corporate enterprise, perhaps the only form in which capital could be secured—a typical method which would directly embody the complete theory—would be for the entire capital stock to be issued to the lease owner as fully paid by the transfer of his leases, and for him then to give one-half of his stock to the individual whom he might persuade to lend the corporation the necessary capital, or to divide it pro rata among investors he might procure. He might do this himself, or he might put it in the hands of a trustee for that purpose.

We see nothing to such a course of business which would raise a presumption that there had been "actual fraud in the transaction" by which the value of the property was agreed upon. There is no substantial difference in principle between such a transaction and one where he returns some of the full-paid stock to the treasury of the corporation, to be disposed of by it on any terms satisfactory to him, in aid of raising working capital. Young v. Erie Co., 65 Mich. 111, 31 N. W. 814. The sole question, then, as before, must be: "Was there actual fraud in the transaction by which the valuation of the property was fixed?" We do not say that such simultaneous surrender of part of the stock received might not tend to show fraud in the valuation; whether it would and how persuasive it would be, would depend on the facts of the case, and upon facts not to be found in this record. See section 46, Cook on Corporations, and cases cited in note (2); also Finletter v. Acetylene Co., 215 Pa. 86, 64 Atl. 429; Clinton Co. v. Jamison (C. C. A. 3) 256 Fed. 577, 167 C. C. A. 607; Fletcher on Corporations, Section 3594. The Delaware cases, Cooney v. Arlington, supra; Scully v. Automobile Co. (Del. Ch.) 109 Atl. 49, and Peters v. U. S. Co. (Del. Ch.) 114 Atl. 598, do not conclude this issue of fact.

Likewise, the personal adverse interest of the accepting directors is not to be overlooked in determining the good faith of the valuation. In the same way, a trier of facts must observe that, by the substance of this transaction, those who loaned the money to the corporation paid a certain sum for the notes and the stock as a unit; that the bonds of a failed corporation may turn out to be as worthless as the stock; indeed, that is said to be the situation here, since the record indicates that there are no assets remaining out of which to pay anything on the debts; that the whole consideration is not always necessarily to be apportioned to the bond, leaving nothing for the stock; and that in perhaps the typical case the investor looks to the contingent profit, indicated by the stock, as an impelling motive to make an unconservative loan. These things will be given such effect as they seem to deserve when the sales of notes and stock are considered as bearing on the valuation of assets.

[4] It would be premature now to determine the ultimate force of conclusions to be reached by the bankruptcy court preliminary to assessment. It should be satisfied that there is a prima facie case of "actual fraud in the transaction." Less than that would not justify an assessment; more than that may not be necessary to find, unless the bankruptcy court in its discretion requires more. In re Remington (C. C. A. 2) 153 Fed. 345, 347, 82 C. C. A. 421; In re Newfoundland Syn-

dicate (D. C.) 196 Fed. 443, 447; s. c. (C. C. A. 3) 201 Fed. 917, 120 C. C. A. 255.

The extent to which the Delaware cases settle the rule for this case as to the rights and duties of those who are both creditors and stockholders has not been considered by the trial court, and we therefore postpone any review thereof until there has been such consideration.

These views make it necessary that the order of the referee should be vacated, and that he should proceed in accordance with them. Further than that, we think it premature to give directions. As the order of the District Court was in effect an entire vacation of the referee's order, it is to that extent affirmed; but the further directions to the referee may well be postponed until there has been a proper finding of prima facie liability. The order will be modified accordingly. There will be no costs in this court to either party.

