## HODGMAN et al. v. ATLANTIC REFINING CO. et al.

(District Court, D. Delaware. July 9, 1924.)

No. 452.

1. **Corporations ⬤⟹99(1)—Agreement to purchase product of corporation not a good consideration for capital stock.**

Under the law of Delaware, a contract for the purchase of the product of a corporation is not a good consideration, in whole or in part, for issuance of its capital stock.

2. **Corporations ⬤⟹314(2)—President or directors may not make secret profits in transactions with the corporation.**

The relations of the president and directors of a corporation to the corporation are fiduciary to the highest degree, and in transactions with the corporation, in which they have a personal interest, there must be the utmost good faith and the fullest disclosure, with no secret profits inuring to them.

3. **Corporations ⬤⟹101—Transaction by which stock of corporation was acquired held fraudulent.**

Transactions through which defendant acquired a large amount of stock of corporation *held* fraudulent, in that the price paid was about one-half that at which other large amounts were at the time being purchased by others, which fact was intentionally concealed from the corporation and other stockholders, through collusion with its president and some of its directors.

4. **Evidence ⬤⟹78—Failure to produce documents warrants presumption that they would be adverse to the party responsible for their suppression.**

Failure to record important documents in the minutes of a directors' meeting, as directed, and failure to produce such documents in evidence, warrants the presumption that they would be adverse to the parties responsible for their suppression.

5. **Corporations ⬤⟹180—Majority of stockholders cannot ratify acts which are a fraud on the minority.**

A majority of the stockholders of a corporation cannot ratify its own acts, or acts of the corporate officers, so as to cut off the rights of minority stockholders, where such acts were a fraud on the minority.

6. **Corporations ⬤⟹190—Stockholders' suit; defendant, fraudulently acquiring stock at less than value, may be required to pay the difference.**

In a suit by minority stockholders against a defendant, which fraudulently acquired stock of the corporation for less than its then market price, rescission is not the only remedy which may be afforded by a court of equity; but the relief must be adapted to the situation when the suit was commenced, and the court may require defendant to pay the difference between the price paid for the stock and the price for which it could then have been sold by the corporation, with interest.

In Equity. Suit by Marshall Hodgman and others against the Atlantic Refining Company and the Superior Oil Corporation, instituted in a state court (after the dismissal, on application of complainants, of a like suit in this court, reported in 274 Fed. 104) and removed to this court by the first-named defendant. Decree for plaintiffs.

Andrew C. Gray and E. Ennalls Berl (of Ward, Gray & Neary), both of Wilmington, Del., Arthur Berenson, of Boston, Mass., and Lawrence Berenson, of New York City, for plaintiffs.

Robert H. Richards, of Wilmington, Del., and Ira Jewell Williams, and Yale L. Schekter, both of Philadelphia, Pa., for defendant Atlantic Refining Co.

⬤⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Charles F. Curley, of Wilmington, Del., for defendant Superior Oil Corporation.

MORRIS, District Judge. Marshall Hodgman and other stockholders in Superior Oil Corporation, a Delaware corporation, brought this bill in equity against that corporation and Atlantic Refining Company. They seek to obtain from the Atlantic Refining Company, for the Superior Oil Corporation, relief to which they assert the Superior is entitled, but to secure which that corporation has neglected and refused to act, notwithstanding the efforts of the plaintiffs directed to that end. The relief sought is based upon the alleged wrongful acquisition by the Refining Company of 325,000 shares of the non-par capital stock of the Superior at one-half its actual value. The vices of the transaction, as plaintiffs assert, are actual fraud in its accomplishment and legal inability of the Superior to issue the stock for one-half of its value.

The asserted fraud consists in the concealment from the Superior of the fact that its shares were being acquired by the Refining Company at approximately $8 per share at the very time that a much larger number of shares was being sold to other persons for $16 per share, as well as being bought and sold generally on the Stock Exchange at $16 to $19 per share. The asserted fraud consists also in uncorrected partial disclosures, calculated to mislead and deceive, made to the Superior with the knowledge of the Refining Company, with respect to the price that was being paid by the Refining Company for the 325,000 shares of the Superior stock. The alleged concealment from the Superior of the price being paid by the Refining Company for the shares of the Superior stock was possible, because, as plaintiffs assert, Robert M. Catts, the president of the Superior and the person through whom the transaction was carried out, aided in the concealment and actively participated in the fraud for his personal gain, and that to this end he made, with the knowledge of the Refining Company, statements to the Superior that were false, deceptive, and misleading.

The Refining Company denies the alleged fraud, and denies that the Superior was without legal power to issue the shares for the consideration moving from the Refining Company. It does not deny, and cannot successfully do so, that on the day on which the Refining Company acquired 325.000 shares at approximately $8 per share 263,375 other like shares of the Superior stock were sold to a syndicate of bankers for $16 per share, in money, and 150,000 still other like shares were issued to Old Dominion Oil Company for property, on the basis of upwards of $16 per share. Shortly before and after it acquired its shares at approximately $8 per share, the Refining Company estimated the outstanding shares of the stock of the Superior to have a value of approximately $19 each.

To establish that the striking advantage obtained by it in the transaction was not a fraud upon the Superior and its stockholders, and was not brought about by fraud of the Refining Company, but was a reasonable and natural outcome solely of fair, frank, and honest dealing, the Refining Company asserts that the transaction with the Superior was had by Catts alone, and that the shares acquired by the Re-

fining Company, by the syndicate of bankers, and by the Old Dominion Oil Company were acquired by them, not from the Superior, but from Catts, and that the price paid to him is no concern of the Superior or of its stockholders. It likewise asserts that, even if its transaction was with the Superior, and that Catts participated therein, not as an independent person, but only as an officer of Superior, still the transaction was a fair, honest, and valid one, in that, in addition to the monetary consideration, it contracted to take Superior's production of crude oil for a period of ten years at Seep's Agency's posted prices; it agreed to deposit its shares for two years and not to sell them or the deposit certificates during that time; it agreed to assume the management of Superior and to nominate men of experience to serve on the Superior's board of directors.

[1] It is now well settled, however, that such contracts or agreements cannot be regarded as consideration for capital stock of a Delaware corporation in any amount. Wallace v. Weinstein, 257 Fed. 625, 168 C. C. A. 575 (C. C. A. 3); Cooney v. Arlington Hotel Co., 11 Del. Ch. 286, 101 Atl. 879, and on appeal 11 Del. Ch. 432, 106 Atl. 39; Scully v. Automobile Finance Co., 12 Del. Ch. 174, 109 Atl. 49; Bowen v. Imperial Theatres (Del. Ch.) 115 Atl. 918. Consequently we must look elsewhere to ascertain why the Refining Company was the recipient of capital stock of the Superior to the value of upwards of $5,000,-000 for approximately one-half that sum. Obviously such an astounding donation by one business corporation to another cannot be said to have been brought about by fair dealing, if it was accomplished by suppression of the true facts, or by false suggestions or half truths calculated and intended to deceive. Yet, notwithstanding my reluctance to believe that the business acts of any apparently reputable person or corporation are done otherwise than in good faith and for an honest purpose, I am constrained by what I think to be the overwhelming weight of the evidence to conclude that the transaction in question was conceived in fraud and consummated by gross deception and dishonesty.

Catts caused the Superior to be organized. While he was still the owner of all of its outstanding shares of capital stock, he caused the charter to be amended, so as to make the authorized capital consist of 300,000 shares without par value, of which, during the fall of 1919, 150,000 shares were issued to him for certain oil leases. On March 2, 1920, after the shares of stock issued to him in the fall of the preceding year had become widely distributed, but while the directorate was substantially the same as that which passed upon Catts' offer of oil leases for stock, Catts made another offer to Superior to sell and transfer to it for 150,000 other shares of its capital stock certain other oil leases, subject to an indebtedness of $2,750,000 to the Refining Company. By the contract made on March 4th following, between Superior, the Refining Company, and Catts, trustee, it was recited that the indebtedness of $2,750,000 to the Refining Company, subject to which the properties were to be acquired, represented a loan made by the Refining Company to Catts, trustee, to enable him to acquire the properties. The loan was to be repaid, with interest, within 1,000 days, by "the trustee or anyone assuming said obligation." The second, third, fourth, and fourteenth paragraphs of the contract provide:

"Second. Upon the acquisition of said properties by said trustee, the same shall be forthwith sold, assigned, transferred, and conveyed by the trustee to company A [Superior] for 150,000 shares of its presently unissued stock, to be issued and delivered to said trustee free from all incumbrances and subject only to the obligation imposed thereon by said trustee of said loan of $2,750,000, *which indebtedness as a part consideration hereof Company A shall assume and agree to repay to Company B [Refining Company] as herein provided*; said 150,000 shares to be issued to said trustee (and of which amount 86,667 shares shall be represented by one certificate issued in the name of Robert M. Catts, trustee) shall thereupon forthwith be indorsed and deposited with Company B as collateral security for the repayment of said loan of $2,750,000, with interest as herein provided. [Italics mine.]

"Third. In addition to the aforesaid 150,000 shares of stock to be deposited with Company B, said trustee will, at the time of said deposit, deposit with said Company B an additional 3,000 shares of the present outstanding capital stock of Company A, duly indorsed for transfer, likewise to be held by said Company B as collateral security for the repayment of said loan and interest as herein provided.

"Fourth. Company A shall enter into a written contract with Company B, under the terms of which Company A shall sell and deliver, in flow tanks at a well to Company B, and Company B shall purchase, the entire crude oil output of Company A's presently owned properties in Kentucky, together with those to be so acquired as hereinbefore set forth by and from said trustee, during said period of five years and so much longer as any part of said loan, with interest, shall remain unpaid, which oil shall be paid for by said Company B at the current price on date of such delivery posted by the Seep Purchasing Agency for Somerset crude oil. * * *

"Fourteenth. Contemporaneously with the making of said loan to said trustee and the acquisition of said properties by Company A as hereinbefore outlined, said trustee will deliver or cause to be delivered to said Company B the resignations in writing of a majority of the board of directors of said Company A, and further the resignations of any directors who may succeed said directors, so that Company B shall always hold the resignations of a majority of the directors of Company A, but with the express understanding that this is only for the purpose of further protecting said Company B in the event that said Company A shall at any time prior to the repayment of said loan, fail to carry out the terms of this contract and/or fail to sell and deliver its said net production of crude oil to said Company B and the repayment of said loan of $2,750,000 and interest under the terms hereof, and shall not be acted upon except in case of such failure by Company A."

The eighteenth paragraph provided in part:

"* * * That one director of said board of directors of Company A shall during the continuance of said loan be and remain a nominee of said Company B for the purpose of protecting said loan and its repayment with interest, and further said Robert M. Catts shall continue to serve as a director of Company A until said loan and interest has been repaid in full."

Mr. E. J. Henry, an officer of the Refining Company, was nominated by the Refining Company and elected to the board of the Superior as the Refining Company's representative on March 4th, the date of the contract. By a supplemental contract of March 9, 1920, it was provided that the word "trustee," as used in the contract, "should mean Robert M. Catts, trustee, for the sole purpose of carrying out the terms and conditions of this contract" in accordance with the provision of the supplemental contract. Catts, as trustee, assigned and transferred to Superior all his right, title, and interest in the 86,667 shares that had been issued in his name, indorsed and delivered by him to the Refining Company as collateral security under the terms of the agreement. He

likewise authorized the Refining Company to deliver the certificate therefor to Superior upon payment of the loan. The remainder of the 150,000 shares, namely, 63,333, were received by Catts, and a part thereof delivered to at least one of his codirectors who had voted in favor of the second transaction. That these shares were to be received by Catts and another director was not revealed, so far as the record discloses, to the Superior.

[2] The president and directors of a corporation occupy positions of trust. Their relations to the corporation are fiduciary to a high degree. The interest of the beneficiary—the corporation and its stockholders—is confided to their care. In that relationship they must be guided solely by their honest and disinterested judgment. They must not place self-interest above the welfare of the corporation. Occupying such a position of trust, honesty and fair dealing, as well as the law, require that in transactions with the corporation in which transactions the president or director has a personal interest, there must be the fullest disclosure, the utmost good faith, and no secret profits inuring to the officer or director from the transactions. Fletcher on Corporations, § 2330 et seq. Obviously the second transaction did not conform to these requirements. Catts was no longer the sole stockholder of Superior, but manifestly his codirectors failed to give heed to that fact, and did little, if any, more than register his will. Apparently the contract took the form of having Catts as a conduit or intermediary between the Superior and the Refining Company, solely for the purpose of endeavoring to give at least some color of right to his personal profit in the transaction. Moreover, it seems clear that the fact that Catts was being unfaithful to his trust and was betraying those whose interests had been confided to his care was not unobserved by the Refining Company.

[3] No sooner had the second transaction been completed than a third, the one here in question, was begun. It involved the acquisition by Superior of at least one very valuable property—that of the Old Dominion Oil Company. A contract to that end was made between Superior (not Catts) and Old Dominion as early as March 15, 1920. To acquire the new property, new financial plans had to be arranged and perfected. The charter was amended, increasing the authorized capital to 2,500,000 shares of non-par stock. A banking syndicate agreed to take a specified number of shares at $16 each. Old Dominion agreed to accept payment, partly in money and partly in shares of stock. The Refining Company, with whom Catts was in constant communication, agreed to take 325,000 shares. With respect to the price to be paid therefor Catts and the Refining Company had a secret understanding that was not disclosed to the Superior. The plan for the acquisition of the third group of properties, conceived and put afoot in March, was consummated on August 5, 1920.

Upon its consummation 954,208 shares of the capital stock of Superior were outstanding. Of these 150,000 shares were those received by Catts in the original transaction; 63,334 shares were those received by Catts for himself and one or more of his codirectors as a result of the second transaction; 263,375 were those bought by the

bankers at $16 per share; 150,000 were those accepted by the Old Dominion in part payment for its property on a basis of upwards of $16 per share; and 325,000 were those obtained by the Refining Company in satisfaction of the unpaid portion of its loan of $2,750,000. The remaining 2,499 shares I fail to find specifically accounted for. As incidents of the transaction the Refining Company obtained the control through a voting trust agreement of 527,500 shares. It obtained a majority of the board of directors and the management of the Superior. During the transaction it obtained a contract for the purchase of the entire production of the Superior at Seep's Agency's posted prices for a period of ten years, in lieu of the five-year contract obtained as an incident of the second transaction. Catts was to receive as compensation for his services 45,000 shares.

The question of fraud turns upon whether or not proper disclosures were made to the Superior with respect to what the Refining Company was to pay for the 325,000 shares acquired by it, or whether the Superior and the Old Dominion, which accepted 150,000 shares in part payment for its property, were deceived by false statements and led to believe that the Refining Company was to pay and was paying $16 per share therefor. Upon this issue there are volumes of testimony, numerous exhibits, almost 100 requests for specific findings of facts, and large briefs. I shall neither review this testimony at length nor deal in detail with the requests for specific findings. In my view of the matter it is unnecessary. There are certain crucial facts which make it impossible for me to reconcile with honesty and fair dealing the acquisition by the Refining Company at $8 per share of 325,000 shares, estimated by it to have a value of $19.58 each, when the bankers were paying $16 per share, the public $19, and Old Dominion was exchanging valuable property on a basis of upwards of $16 per share. The Refining Company was not a charitable corporation. The record discloses no reason why from $2,500,000 to $3,000,000 should be taken from the stockholders of the Superior and given as a gratuity to the Refining Company and its stockholders.

Assuming arguendo that the Superior had the legal power to issue stock for contracts, it cannot be that it was necessary to give to the Refining Company a huge sum of money in order to get the Refining Company to agree to take at posted prices, without the payment of any premium, for an additional period of five years, the entire production of Superior. The Superior product was of a desirable quality, and usually sold readily at a premium above posted prices. It was greatly desired by the Refining Company, as was already known to the Superior. In its letter of August 5, 1920, to Superior, the Refining Company said that its offer with respect to the shares was made "without in any way affecting our contract of June 24, 1920, with your corporation for the purchase of crude petroleum for the period of ten years." Later it said:

"The overbearing element of our decision was our desire to assure for our refineries for a long period of time the appreciable and staple quantity of crude oil which Mr. Catts so specifically promised."

Again it cannot be that it was necessary for Superior, even if such an act had legal validity, to pay to the Refining Company $2,500,000

to $3,000,000 in capital stock to manage an oil company having assets of the value, as fixed by the Refining Company, of $18,869,926.05, all of whose crude oil output was greatly desired by the Refining Company and to be purchased by it for a period of ten years. Yet no other reasons are advanced by the Refining Company to account for its being favored over the bankers, over the stockholders of Old Dominion, and at the expense of the stockholders of Superior to the extent of $2,500,-000 to $3,000,000. If the Refining Company was to be and was the recipient of such an advantage as a result of fair, frank, and honest dealing, one would expect to find full evidence of that fact in the records of the transaction.

To what place in the record are we to turn to find any indication from the Refining Company to the Superior, or from the Superior to the Refining Company, to the effect that the Refining Company was to get or was getting its shares for $8 each? The Refining Company does not tell us. But let us assume, arguendo, that the Refining Company was under no obligation to speak during the transaction, or to tell the price at which the shares were being obtained by it; yet, if it did speak, honesty and fair dealing, as well as the law, required, not only that it should speak no falsehood, but also that it should neither utter nor knowingly permit any one else to utter unchallenged any half truth or false suggestion that would lead the minds of those interested away from the true facts. It did speak, or did knowingly permit others to speak. The statements made, however, were not fair and honest, but, in so far as they were not misleading generalities, were actually false. They not only failed to state that the Refining Company was getting its shares at about $8 each, but they were so phrased as to create the impression that the Refining Company was paying $16 or more per share.

On June 7 and June 10, 1920, Catts presented to meetings of the board of directors of Superior, at both of which meetings the Refining Company's representative, Henry, was present, a communication, the clear inference of which was that the bankers and the Refining Company were to pay the same price. The Refining Company knew that the bankers were to pay $16 per share. Moreover, there were then outstanding at least four documents, in which it was stated that the Refining Company was to pay at least $16 per share. The Refining Company knew that the impression had gone forth that it was to pay at least $16 per share; yet it permitted Catts' statements to the board of directors of Superior to go unchallenged. It heard in silence the same statements made to the stockholders on June 22. It heard at each of those meetings the express statements by Catts:

"I will also cause to be delivered to you *as a part* of the purchase price of said stock by the Atlantic Refining Company my note for $2,750,000 to the Atlantic Refining Company, indorsed by your corporation, canceled and stamped paid."

Still it remained silent, failed to point out that what was stated as a part of the purchase price was in fact the full purchase price, and accepted the fruits of the deception. The letters of June 8, 9, and 10 between the bankers, Catts, and the Refining Company disclose that the

Refining Company was willing that the bankers should be deceived by Catts, and that Catts proceeded to make statements indicating that the Refining Company was paying $6,000,000, or $18.46 per share, for its stock. A secret understanding existed between the Refining Company and Catts as to the price to be paid by the Refining Company. Nowhere does it appear that either the existence or the substance of this agreement was revealed to the Superior.

Again, in the letter of August 5, 1920, from the Refining Company to Superior, there is lacking that definiteness and certainty with respect to the price being paid by the Refining Company which fair dealing would lead one to expect, particularly in view of the false impression which, to the knowledge of the Refining Company, existed as to the price that was to be paid by the Refining Company for the 325,000 shares of stock. The letters just mentioned show that the Refining Company was the source and instigator of that false impression. The preamble to the resolution of June 7 was couched in terms peculiarly appropriate to create in the minds of those directors who were not involved with Catts the belief that the Superior was indebted to Atlantic for sums other than the unpaid portion of the loan of $2,750,000, and that such sums would aggregate $16 per share. The preamble to the resolution reads in part thus:

"Whereas, the directors have, after careful consideration, determined the value of the aforesaid properties so offered to be transferred by Mr. Catts to this corporation, based upon present. conditions and crude oil prices, to be not less than $19,000,000, and probably of much greater value, and when taken into consideration with the cancellation of this corporation's obligation .of $2,750,000 to the Atlantic Refining Company *and all other obligations to that company on account of loans or advances to or for its account in connection with said properties, furnishes an actual consideration for said stock in excess of $16 per share.* * * * *" (Italics mine.)

The final resolution of August 5 is phrased in language most fitting to preserve the false impressions theretofore created. It is:

"Resolved, that the board of directors hereby accept the offer of the Atlantic Refining Company, dated August 5, 1920, upon the terms thereof; and

"Further resolved, that the proper officers of this company be and they hereby are authorized and directed to deliver to the Atlantic Refining Company, or their nominee, in full payment of all indebtedness of this company to the Atlantic Refining Company (as per schedule to be agreed upon between the officers of this company and the Atlantic Refining Company, setting forth in detail the items of such indebtedness), 325,000 shares of the common stock of this company. * * * "

That the tenor of these resolutions was not unknown to the Refining Company may be presumed, not only from Catts' secret relations to it, but as well from the fact that Henry was put upon the Superior's board of directors as the Refining Company's representative or agent. It is a principle of law that it is the agent's duty to communicate to his principal the knowledge which he has respecting the subject-matter of the negotiation, and the presumption is that he performs that duty. Thomson-Houston Elec. Co. v. Capitol Elec. Co., 65 Fed. 341, 12 C. C. A. 643. The iniquity of Catts, and the fact that there were directors of the Superior, other than Catts, who hoped secretly to profit by the transaction at the expense of Superior, are shown, not only by the secret

profit obtained from the second transaction, but also and more particularly by the letters of Catts to William M. Irish, vice president of the Refining Company, asking for and stating the reasons why he was entitled to the release by the Refining Company of many thousand shares of Superior's stock at cost for distribution among five out of the eight persons who were directors of Superior on August 5, 1920.

[4] Again, the minutes of the directors' meeting of Superior held on June 7, 1920, state:

"Mr. Catts also read to the meeting his contract with the bankers relative to the sale by him of certain of said stock, and his proposed contract with the Atlantic Refining Company relative to the sale by him to it of 325,000 shares of said stock."

Neither the contract with the bankers nor the proposed contract with the Refining Company has been produced. At the meeting of stockholders of June 22 the letter of Catts presented to the directors on June 7 and 10 was read. The letter refers to annexed Schedules A, B, and C as setting forth a list of properties to be acquired. The minutes state that the secretary was directed to place copies of the schedules in the minute book immediately following the minutes of the meeting. The schedules are not there, nor were they produced at the trial. It is probable that these schedules indicated the acquisition of such properties as would make necessary the payment by the Refining Company of $6,000,000 for the 325,000 shares to be acquired by it. These documents are most pertinent upon the issue of fraud. Their pertinency resides in the fact that the bankers were led to believe that the Refining Company's proposed investment was $6,000,000, or $18.46 per share.

It is difficult to believe that the schedules disclosed that the impression which had been given to the bankers by the Refining Company and Catts was false. The natural presumption is that they were necessarily confirmatory of that impression. In any event, the nonproduction of these several pertinent and important documents warrants the conclusion that, had they been produced, they would not have supported the Refining Company's position. Kirby v. Tallmadge, 160 U. S. 379, 16 Sup. Ct. 349, 40 L. Ed. 463; The Bolton Castle, 250 Fed. 403, 162 C. C. A. 473; Armstrong v. Belding Bros. & Co., 297 Fed. 728 (C. C. A. 2).

I think it unnecessary to refer specifically to more of the evidence. The transaction, as I view it, is consistent with no hypothesis other than that of deliberate fraud. Honesty is not found in an atmosphere of deception. Suggestions of falsehood are not the indicia of its presence. It cannot exist where truth is suppressed. It does not consist in mere observance of form. It does not seek to divert the mind by half truths. It does not induce betrayals of trust. It does not share in profits so acquired. Honesty exists only where there is fairness and straightforwardness of conduct.

But was the principal with whom the Refining Company dealt Catts, and not the Superior? The payment by Superior to Catts of his expenses incurred in connection with the acquisition of the properties, the subsequent issuance to him of shares of stock as compensation for his services, the contract of Old Dominion, made, not with Catts, but with Superior, the issuance of the stock certificates, not to Catts, but

to the Refining Company, all disclose that Catts was not a principal in the transaction with the Refining Company. The principal was the Superior. Catts was its president. But, had Catts been the principal, no advantage would inure to the Refining Company thereby, for the Refining Company would have known all the circumstances of concealment, deception, and misrepresentation under which the capital stock would have been acquired by Catts, and the consequent rights of the Superior with respect thereto. Fletcher, Cyc. Corp. §§ 2303 and 2366. The Refining Company would not have been a bona fide purchaser for value, and the rights of the Superior and its stockholders against it would have been in no wise different from their rights against Catts.

[5] The Refining Company contends that in any event the entire transaction was ratified by the stockholders of Superior, so as to foreclose any action by minority stockholders. This contention is predicated upon action taken by the stockholders of the Superior at the annual meetings held in April, 1921, and in March, 1922. At the meeting held in April, 1921, a resolution was offered which, after reciting the pendency of a suit in this court instituted by stockholders of the Superior against the Refining Company and Superior, and the hostile position taken by the Superior in that suit, directed the officers of Superior to withdraw all opposition to the suit and to institute suits at law or in equity to redress the alleged wrongs by the Refining Company. Upon an "aye" and "nay" vote, "the chair declared that the resolution was lost." At the meeting held on March 28, 1922, a resolution approving the action of the company in not accepting the offer of the Refining Company, made December 20, 1920, to return the stock of the Superior issued to the Refining Company, to rescind the ten-year contract between the Refining Company and Superior for crude oil, and to reinstate the status in effect prior to August, 1920, received the affirmative vote of 137,161 shares. The Refining Company, apparently, did not vote. No votes were cast against the resolution.

Neither action was an express ratification of the transaction which culminated on August 5, 1920. If either or both may be considered as an attempted implied ratification, it must be remembered that "a majority of the stockholders cannot ratify acts of corporate officers, so as to cut off the rights of minority stockholders, where such acts are a fraud or abuse of the trust confided to the officers." Fletcher, Cyc. Corpo. § 2397; Brewer v. Boston Theatre, 104 Mass. 378, 395. "The majority cannot ratify its own or others' fraud upon the minority." Fletcher, Cyc. Corpo. pp. 6962, 6963; Dana v. Morgan (D. C.) 219 Fed. 313; Hyams v. Calumet & Hecla Mining Co., 221 Fed. 529, 137 C. C. A. 239.

In view of the foregoing conclusions with respect to the issue of fraud, it becomes unnecessary to determine or consider whether, in the absence of fraud, the Superior would have had the legal power to issue shares of non-par stock at one-half their value, or issue such shares at the same time to different persons for widely varying prices.

[6] As to the character of relief which can be afforded, it is said by the Refining Company that rescission is the only remedy. But rescission is not the only remedy in cases of this character. Old Dominion

Copper, etc., Co. v. Bigelow, 203 Mass. 159, 201, 202, 89 N. E. 193, 40 L. R. A. (N. S.) 314. In Yeiser v. United States Board & Paper Co., 107 Fed. 340, 349, 46 C. C. A. 567, 52 L. R. A. 724 (C. C. A. 6), it was said that the relief must be adapted to the situation at the time it was applied for; that is, when the suit was commenced. In Chandler v. Bacon (C. C.) 30 Fed. 538, promoters had issued to themselves shares of stock without consideration. The master found that the defendants should pay $7 per share therefor. Judge Colt, in sustaining this finding, said:

"I think the company had a right to elect (1) whether they would have the shares transferred back to them; or (2) if the shares had been sold, that these defendants should turn over the entire profit made by the sale; or (3) that the company may say: 'Although you may have derived no profit by selling the shares, yet you deprived us of placing them with other persons, and you must therefore pay us the sum we have lost by reason of our being deprived of the right of placing these shares with other persons.' Carling's Case, 1 Ch. Div. 115, 126, 127; McKay's Case, 2 Ch. Div. 1; De Ruvigne's Case, 5 Ch. Div. 306; Nant-y-glo, etc., Co. v. Grave, 12 Ch. Div. 738. The last measure of damages has been adopted by the master in this case. It is in proof that a large amount of the stock of the company was placed at a uniform price of seven dollars a share, and the defendants are called upon to account for their stock at this price. I can see no error in this finding of the master."

The record discloses that at or about the time of the commencement of this suit the shares of stock acquired by the Refining Company were worth or were selling for approximately $4 per share. The plaintiffs urge that a present restoration of the indebtedness of the Superior to the Refining Company for the surrender of the 325,000 shares of stock at $4 per share would result in giving to the Refining Company about $2,500,000 for shares of stock worth $1,300,000, and the plaintiffs, consequently, ask for damages to the extent of the difference between the amount of the indebtedness of the Superior to the Refining Company at the time the shares were issued and the sum of $5,200,000, being the price that the Superior would have received for the 325,000 shares at $16 per share. I am of the opinion that the payment of such sum, together with interest thereon at the rate of 6 per centum per annum, computed with annual rests, is the proper relief in this case with respect to the shares of stock.

The oil contract was a transaction separate and apart from the stock transaction. It was entered into on June 24, 1920, while the stock transaction was not consummated until August 5 following. That the two transactions were not interdependent is disclosed by the letter of the Refining Company to the Superior of August 5, 1920. That the oil contract resulted from the fraud perpetrated upon the Superior by Catts and the Refining Company is not, I think, open to question. I think the ten-year oil contract should be canceled, and the five-year oil contract restored.

A decree in conformity herewith may be submitted.