Joseph J. Bodell, Frederick Bodell, Louis C. Gerry, Frederick B. Wilcox, Harold C. Field and Antonio Lazo, copartners trading under the firm name and style of Bodell & Co.,

*vs.*

General Gas & Electric Corporation.

*New Castle, March 2, 1926.*

*Herbert H. Ward*, of the firm of Ward, Gray & Ward, and with him Hawkins, Delafield & Longfellow, of New York City, for complainants.

*William S. Hilles*, and with him *Pendleton, Anderson, Iselin & Riggs*, of New York City, for defendant.

THE CHANCELLOR. The complainants state their contention in this case under two heads. They are, (a) the practice complained of constitutes a conscious offer of no par value stock below its fair

sales value, and, like all such offers is illegal; and (b) even if a conscious offer of no par value stock below its fair sales value may be legal if made to certain persons, it is illegal if made to the A stockholders alone in addition to their quarterly cash dividends of thirty-seven and one-half cents per share and before the B stockholders have received $1.50 per share. No attempt will be made in the ensuing opinion to divide the discussion into two parts corresponding to the two headings. The general discussion which follows will, however, disclose my views upon both branches of the argument.

The principal statutory provision with which we are concerned in this case is found in *Section 4a* of the *General Corporation Law*. That provision is, as follows:

"Such capital stock without nominal or par value * * * may be issued by the corporation from time to time for such consideration as may be fixed from time to time by the board of directors thereof, pursuant to authority conferred in the certificate of incorporation or in any amendment thereof, or if such certificate or amendment thereof shall not so provide, then by the consent of the holders of two-thirds of each class of stock then outstanding," etc.

This language appears in the section authorizing the creation of stock without nominal or par value, which section was first adopted as a part of the Corporation Law by the act approved March 20, 1917 (29 *Del. Laws*, *c.* 113). By this act, the plan of no par stock was permitted with respect to common stock only. Now however, by virtue of an amendment approved April 2, 1925 (34 *Del. Laws*, *c.* 112), no par stock is allowed as well with respect to preferred stock. The quoted language, whether the stock be an issue of common or of preferred, is applicable.

Here we are not concerned with any question relating to the two classes of preferred stocks of this corporation. The controversy has solely to do with the right of the directors to issue no par common stock A to present holders of that stock, for the consideration of twenty-five dollars per share to the extent of their dividends while at practically the same time they offer to sell and succeed in selling to all other classes of stockholders, or in the alternative to underwriting bankers, a much larger number of shares of the same kind of stock at forty-five dollars per share.

The certificate of incorporation confers upon the directors authority to issue the stock. The provision in the quoted language concerning the necessity of consent on the part of two-thirds of its stockholders is therefore not involved in the case.

Nor is the general preemptive right of stockholders to subscribe for stock involved in the consideration of the case. The complainants in their reply brief concede this.

Stock without nominal or par value, though not a new feature in corporate structures, has had a distinct revival in recent times. Until a few years ago, capital shares were almost invariably, if not entirely, associated in this country with the conception of a par value expressed in dollars. When the plan of issuing shares without nominal or par value was adopted by this and other states, it was certainly intended by the legislative authority to introduce into the characteristics of such stock qualities which capital stock, in the theretofore existing conception of the term, did not possess. Our Superior Court in, *State v. Benson*, 32 *Del. Rep.* (2 *W. W. Harr.*) 576, 128 *A.* 107, observed that "shares of no par stock represent aliquot or proportionate parts of the capital." This same statement might also be made of shares having a par value. What the Superior Court meant to emphasize by the quoted language doubtless was, not that no par shares were in the particular of proportionate ownership distinguishable from shares having a par, but that with respect to this feature the no par shares on their face, unlike par value stock, contained no reference to a dollar value. Thus the holder of no par shares would see from the certificate itself that he was only an aliquot sharer in the assets of the corporation, whereas if the shares were of the par value type the holder might in looking at the dollar value be beguiled into the thought that what he had was shares of actual value equal at least to the par denomination in dollars. Upon the feature now being considered, the difference between stock of a par value and of no par value, upon analysis consists not in a difference with respect to a proportionate or aliquot share in the corporation's assets and business, but in the fact that in the case of the latter this character of proportionate interest is not hidden beneath a false appearance of a given sum in money. It is of course common knowledge that though a stock may have a par value of one hundred dollars, it may, because of its aliquot nature, be worth

that, or more, or less, dependent upon the value of the entire assets of the company. The frankness of no par value shares in claiming nothing more for themselves than an aliquot share of the assets without reference to a dollar value, is one of the things that has commended them to the favorable notice of their advocates. But this particular difference between the modern no par stock and its companion, the par value stock, is not of particular moment here.

Another difference between the two, which is more to the point in the instant case and of quite vital interest in considering the questions of law with which we are here concerned, has to do with the consideration which is required to be exacted by the corporation for the issuance of its stock. The introduction into our law of stock without par value has not of course resulted in allowing a different kind of consideration to be received for it from that which has heretofore been required for par value stock. In other words, whether the stock have a par value or none, it still remains true that—

"No corporation shall issue stock, except for money paid, labor done or personal property, or real estate or leases thereof actually acquired by such corporation." *Article* IX, § 3, *Constitution of Delaware.*

As to the kind or quality of consideration for which stock may be issued, no par stock is in exactly the same situation as is stock having a par value.

But upon the point of amount of consideration, there is a distinct and pronounced difference between the two. With respect to par value stock the law sets up a standard in dollars with which the consideration given must square itself. That standard is of course the par value of the shares issued. It is this feature of par stock which, more than the other one of lack of frankness above referred to, served doubtless to induce those interested in corporate activities to advocate the idea of stock without nominal or par value. The manifest danger of an overvaluation of assets given in exchange for par value stock and the risk of liability consequent thereon in the cases of both new and going concerns, and the rigid straight jacket into which corporate financing by sales of stock of a going concern was placed if the actual value of its stock had fallen below par, were the prime considerations which prompted corporate organizers and managers to evolve some plan for stock is-

sues which would liberate shares of stock from the thraldom of the par value feature. Whether the reasons advanced were sound ones and well-grounded in a wise public policy is not for me to say. The fact is that they prevailed with the Legislature of our State and now find the object which they were advanced to promote embodied principally in *Section 4a* of our *General Corporation Law*.

That section does not set up a par value standard to which issues of stock authorized by it must comply. While the section does not attempt the vain thing of disturbing the constitutional requirements as to the kind and quality of consideration which must be given for stock, it does destroy absolutely the quantity of consideration which must underlie the shares of stock authorized by it. This is the real substantial difference which *Section 4a* creates between the no par stock authorized by it and the par value stock theretofore as well as now authorized to be created. Not more than one hundred shares of stock having a par of one hundred dollars can be issued for ten thousand dollars worth of consideration. But for the same amount of consideration any number of no par value shares may be issued. So far as the amount of consideration is concerned it may be run out to an infinitesimal sum under each no par share. This is the literal meaning of the section. All the directors have to do, if they are given the power as they were here, is to fix the consideration. Its amount is of no moment. So far as the literal language of the section is concerned, the directors may from time to time issue no par stock for any consideration they may see fit, even though the price they fix is far below its actual value. For instance, if the outstanding no par stock is actually and demonstrably worth three hundred dollars a share, there is nothing in the statute which would prevent the directors from issuing additional stock to outsiders at ten dollars per share. What I am now pointing out is simply this—that the statute does not impose any restraint upon the apparently unbridled power of the directors. Whether equity will, in accordance with the principles which prompt it to restrain an abuse of powers granted in absolute terms, lay its restraining hand upon the directors in case of an abuse of this absolute power, is another question which will be presently considered and answered in the affirmative.

Just now I am endeavoring to point out that the section which deals with no par stock furnishes no yardstick, as in the case of par value stock, by which the amount of the consideration is to be measured. It does not substitute for the standard of a par value another standard, for instance, a real, or market, or book value. When, therefore, the complainants object that what the directors did in this case "constitutes a conscious offer of no par value stock below its fair sales value, and, like all such offers, is illegal," they cannot point to any language in the statute upon which to hinge their objection. The statute makes no mention of "sales value," or of any other similar thing to which no par stock issues must conform themselves.

But notwithstanding the absolute character of the language in which the power to the directors is expressed, it cannot be that a court of equity is powerless in proper cases to circumscribe it. The section requires the directors to fix the consideration. It certainly would be out of all reason to say that no court could review their action in fixing it. I do not understand the defendants to argue that the action of the directors in this particular is not reviewable. They do insist, however, that inasmuch as the matter of the issuance of the stock was placed by the certificate of incorporation in their control, the general principle which excludes stockholders from matters of management and accords to the acts of the directors a presumption in favor of their propriety and fairness, is to be here applied. This is true.

There is no rule better settled in the law of corporations than that directors in their conduct of the corporation stand in the situation of fiduciaries. While they are not trustees in the strict sense of the term, yet for convenience they have often been described as such. With respect to the unissued stock, they are said to control it as trustees. With respect to par value stock their duty is to authorize its issuance only for property equalling its full par value. But stock of the kind here involved has no par value. What consideration should the directors demand for its sale? In answering this question, it would seem that the answer should turn very largely upon the stage of the corporation's development at the time of the issuance.

If the corporation has just been formed, I do not see that it can make any difference how much or how little in the way of consideration is received for its original no par stock, so long as the consideration is lawful in its quality. If the assets received are one thousand dollars in money, it is of no consequence whether five shares or ten shares, or one thousand shares are given for it. Each share has its one-fifth or one-tenth or one one-thousandth aliquot part of the thousand dollars as the case may be, and no one is damaged because everyone knows that under each share is simply its proportionate part of the total assets, unexpressed in terms of money.

But suppose after the corporation has been in business for some time and has built up a surplus above the assets originally received, then it is apparent that the price at which additional stock is issued does have a very material effect on the interests of the existing shareholders. If it is now desired to raise more capital by the sale of new shares, it is manifest that inasmuch as a new divisor for the total assets is to be found, it becomes of vital interest to the existing stockholders to see to it that the value of the fraction representing the present aliquot interest in the assets held by each is not diminished. This interest is so vital that courts have in other connections regarded it as an equity entitled to protection against action which threatens its impairment. It is the consideration, for instance, together with the equity that demands a preservation of the proportionate voting power in a corporation, upon which is founded the doctrine of the stockholder's preemptive right to subscribe for stock. *Gray v. Portland Bank*, 3 *Mass.* 364, 3 *Am. Dec.* 156; *Wall v. Utah Copper Co.*, 70 *N. J. Eq.* 17, 62 *A.* 533; *Stokes v. Continental Trust Co.*, 186 *N. Y.* 285, 78 *N. E.* 1090, 12 *L. R. A.* (*N. S.*) 969, 9 *Ann. Cas.* 738. If new shares of a going corporation are to be sold and the price per share is less than the present value of each aliquot interest, and if the new shares go to outsiders or to a selected group of insiders, those stockholders who are not permitted to subscribe are bound to suffer a diminution of the value of each proportionate interest held by them, unless they are allowed to take their proportionate part of the new shares. The doctrine of preemptive right has therefore been erected by equity for their protection in

this regard. Nor does the fact that earnings have not yet accumulated alter the situation with respect to this doctrine, for as said by the courts in the cases just cited a shareholder's interest is confined not alone to present, but as well to anticipated increases in its earnings.

Notwithstanding therefore the absolute terms in which the power of the directors of this corporation to fix the price at which its unissued stock may be sold is expressed, equity will nevertheless by an analogy to that reasoning which underlies the doctrine of preemptive right interfere to protect existing stockholders from an unjustified impairment of the values underlying their present holdings, where it is proposed by the directors to fix the consideration to outsiders or a selected group of insiders for new, shares of the no par value type. The power of the court to interfere, however, must be exercised in accordance with general equitable considerations, for the justification for its interference rests not on statutory provisions, but upon its broad equitable power to protect against wrongs. Take the glaring case put a moment ago, of a proposed sale by directors to outsiders of stock for ten dollars a share which is demonstrably worth three hundred dollars a share. Surely no court on that bald showing of facts would allow the transaction to proceed. There could be no semblance of right in thus offering to others an equal equitable share in the assets belonging to existing stockholders without paying fairly therefor.

Nor do I think that if the directors propose to sell stock to some persons at twenty-five dollars a share and at the same time are successfully marketing a much larger block of the same stock at forty-five dollars a share, the transaction on that bare showing can in the absence of satisfactory explanation stand, for common sense would suggest that if a large quantity could be made to produce forty-five dollars a share a smaller quantity ought not to be regarded as productive of only a possible twenty-five dollars a share. As before stated, directors are regarded as trustees in the matter of the disposal of unissued stock. It is not always necessary for them to reap a personal profit or gain a personal advantage in order for their actions in performance of their *quasi* trust to be successfully questioned. Trustees owe not alone the duty to refrain

from profiting themselves at the expense of their beneficiaries. They owe the duty of saving their beneficiaries from loss. *Cahall v. Burbage*, 14 *Del. Ch.* 55, 121 *A.* 646; *Allied Chemical & Dye Corp. v. Steel & Tube Co.*, 14 *Del. Ch.* 1, 64, 120 *Atl.* 486, 122 *Atl.* 142. And so here, if the sale of this stock to the Class A common stockholders at twenty-five dollars per share to the extent of their dividends (it would take about 4,000 shares) works out an injury to the holders of Class B common, the fact that the directors are gaining no advantage thereby is immaterial.

The complainants are necessarily resting their case on an equity which they erect and seek to impose on the statutory power of the directors. The equity is founded on the principles of fairness. If what is proposed to be done, however, is in fact not unfair nor unjust to the complainants, they cannot successfully claim relief. The cases which find an exception to the application of the doctrine of the stockholders' preemptive right to subscribe when no injury is seen, show that when the element of unfairness is absent, the doctrine is inapplicable. This but emphasizes the fact that questions of the type we are here considering are thrown into the broad general field of fair and just dealing, and are to be answered by equity in the light of those conceptions by which the acts of men are appraised as fair and just or otherwise.

The mere showing of the two prices would without satisfactory explanation undoubtedly entitle the complainants to relief. But if these two prices are justified by a showing of fairness in the light of all the circumstances so that what appears to be an injury turns out to be a benefit to those complainaing, there can be no ground for interference. If the directors, in the course they are pursuing are acting in the genuine and beneficial interest of the corporation and are thereby promoting the interest of all stockholders in a very tangible way and especially the interest of the class of stockholders who are complaining, why should not the general principles applicable to persons standing in trust relationship come to their supporting aid?

The injury which the complainants point out consists in this. They contend first that if a sales price for Class A common stock is established by sales at forty-five dollars, such price is the sum which directors must demand for all stock concurrently offered.

Class B common is junior to Class A common both with respect to dividends and on liquidation. If less is realized for Class A than is fairly obtainable it is manifest, say the complainants, that less capital is brought in than would otherwise be possible and so Class B common would suffer in that less earnings would accrue from which Class B might hope for its junior dividend rights to be taken care of, and on liquidation less capital would be on hand for distribution and the amounts distributable to it thereby diminished. This in the main is the line of argument by which the complainants as holders of Class B common stock seek to establish the injury which is done to their equity in this corporation.

Now on the other hand, the defendants point out that the policy heretofore adopted and proposed to be continued until conditions warrant a change, of allowing Class A common stock dividends to be used in subscribing for further stock at twenty-five dollars per share, has been the very thing which has enabled the corporation to sell its Class A common stock in large blocks at forty-five dollars a share and has caused it to sell on the exchange for from fifty dollars to sixty-four dollars a share. It has had this result they say for the following reasons. Class A common stock is entitled to a dividend of $1.50 a year ahead of Class B. This dividend is not cumulative. Class A common also has a right to further dividends equally with Class B common after the latter is paid $1.50 a year. Class A common was advertised to the public as being a stock which would immediately go upon a dividend basis of $1.50 a year. It of course still had and has a prospective right to further possible dividend declarations. But these lie in the realm of possibilities, which are dependent upon earnings. The problem which the directors had before them was to induce the public to buy the Class A common at as high a figure as they thought could possibly be obtained. They fixed forty-five dollars a share as the price they thought they could obtain. Bankers were called in to make a market for the stock at that figure. They did so selling 120,000 shares upon the organization of the company. The public was told that the first dividend could be used in buying further stock at twenty-five dollars a share. The stock which was thus sold at forty-five dollars was regarded by the purchasing public as yielding an immediate return of only $1.50 a year. That

would be six per cent. on twenty-five dollars and only three and one-third per cent. on forty-five dollars, the price paid. Something, it is argued, must have been offered as an inducement to the public to persuade it to invest money on a three and one-third per cent. basis. The directors and bankers thought that the right to use dividends in further subscriptions at twenty-five dollars per share would supply the additional something to induce the investing public to buy. At all events by the exercise of those methods which investment bankers are versed in, the stock was sold and at the same time, by those methods which investment bankers again are skilled in employing, the market quotations of the stock showed prices ranging from fifty dollars to sixty-four dollars per share. Thus the right to subscribe dividends for stock at twenty-five dollars per share held out the prospect to the stockholders on the basis of the issuing price of forty-five dollars a share, of making a profit of twenty dollars a share on the stock taken for dividends in case it was desired to sell it. The bankers of course played up this feature in marketing the stock and by their operations on the exchange created a price which subsequently made the prospect of profit even more inviting.

Now when it was desired to sell 48,000 more shares of Class A common, it was announced that the right to use dividends in subscribing for further shares of the same kind at twenty-five dollars would continue as a policy. This policy it is claimed made the sale of the additional stock an easy matter, for in addition to the regular dividend of $1.50 a year which the stock was paying, the announced policy held out to purchasers the prospect, just referred to, of making a profit on the stock they might take at twenty-five dollars for their regular dividends. Thus, to use an old expression the stock lifted itself by its own boot-straps. If the value of forty-five dollars per share is thus created by the combined action of the announced policy and the creation of market prices by the sustaining operations of the bankers on the exchange, it is manifest that forty-five dollars, the price which was concurrently obtained by the corporation when it was announced that Class A dividends would be allowed to buy it at twenty-five dollars per share, does not represent a sales price which the directors can in fairness be held to. It would be highly unreasonable to point to sales at forty-

five dollars as showing the inadequacy of sales at twenty-five dollars if the latter was what in fact made the former possible.

It is difficult of course for any one to measure in exact dollars the extent to which the announced policy has contributed to the price of forty-five dollars as well as to the market prices of this stock. That it had weight I have no doubt. The quotations of prices for certain insurance company stocks at figures far in excess of the usual investment bases, show how rights to take stock may contribute to market values. So, also, doubtless, is the market price of American Telephone & Telegraph Company's stock affected by the practice of that corporation in selling its new issues to stockholders at par. That the directors of the defendant company honestly believed that their policy of allowing Class A common dividends to be used to purchase further stock at twenty-five dollars a share would make a highly favorable price for that stock, the stock to which they looked for additional corporate funds, and more of which the development plans would require to be marketed, is not on the present showing to be doubted. A complete absence of selfish motive and of personal profit on their part forcefully argues that their judgment was formed in absolute honesty and entire good faith. If, as a result of the policy thus grounded, the corporation is able to secure funds from stock sales greatly in excess of the amount they otherwise could hope to realize, it is manifest that an advantage has been secured for the corporation and for all its stockholders. The directors take the view as disclosed by the answer and affidavits that the announced policy has in fact yielded such advantage in an exceedingly large amount. They think that if it were not for the policy in question the block of 48,000 shares recently sold would not have been marketed at much if any above twenty-five dollars per share. It is of course a difficult matter to market a quantity of stock of that volume. It would be fatuous to expect to get the quoted exchange price of fifty dollars or sixty-four dollars a share for it by the simple process of offering it for sale on the stock exchange. Such an offering would have caused the market in the stock to crash beneath its weight and in the end would have resulted in a sacrifice of the offered shares. Now in this situation it does not seem fair to say that the course the directors pursued did not result in securing a price sub-

stantially above, possibly twenty dollars a share above, the price which but for such policy could otherwise have been obtained. It being a matter appropriately lying within the field of that discretion which directors are recognized to control, I do not feel disposed in the absence of a showing of improper motive to assume to interfere with it.

What has been the result of this piece of financing? It is this —48,000 shares have been sold at forty-five dollars, and as a contributing cause making that price possible only 4,003 shares have been offered at twenty-five dollars. From the viewpoint of the Class B common stock, Class A shares which have a prior charge of $1.50 a year, or six per cent. on twenty-five dollars, have been placed at forty-five dollars a share. This corporation's money earns eight per cent., so the affidavits show. For each forty-five dollars received, therefore, the corporate treasury will annually earn $3.60 which after deducting the prior $1.50 per year on the Class A common which was sold leaves $2.10 a year available for the $1.50 a year dividend on Class B. To the extent that the absence of the policy referred to would result in reducing the obtainable price for the Class A stock below forty-five dollars, the benefit to Class B would be correspondingly reduced. Furthermore, in case of dissolution the price of forty-five dollars leaves twenty dollars for the Class B stock after paying Class A its liquidation value of twenty-five dollars. Thus again, to the extent that the forty-five dollar price is due to the policy referred to, Class B is benefited. It is to be noted also that the stock taken by the Class A dividends is required to pay a per share price which is equal to its own prior liquidation charge in case of dissolution, and in the meantime will at the eight per cent. rate of earnings yield fifty cents a year more than its own annual dividend requirement of $1.50. I do not pretend to say by what precise amount Class B common stock has been benefited by the policy of allowing Class A common stock to use its dividends in purchases at twenty-five dollars. That it has been considerably benefited, I cannot doubt on the showing made. The benefit may or may not have been to the extent of twenty dollars for every share sold as believed by the defendants. That is a matter of opinion, and there is no good reason shown why this

court should upon that matter of opinion reject the judgment of the directors as unsound.

The equity upon which the complainants rely is founded on the conception that an injury is done them. If no injury appears, no equity exists. On the showing made it seems that instead of an injury a benefit has been conferred. While it has nothing to do with the merits of the cause, yet it is interesting to note that the directors themselves own no Class A common stock but do own about two-thirds of the common stock Class B, and if wrong is done to that class of stock the directors who have done it have visited most of its consequences upon themselves.

There remain a few observations to be made with respect to some of the contentions advanced at the argument and not before commented upon. Not only did the complainants point to the con-current price of forty-five dollars per share received for Class A common stock, but they also pointed to the market range of from fifty dollars to sixty-four dollars on the New York Stock Exchange and the admission in the answer that the book value is above twenty-five dollars a share, as showing the fair value which the directors in exercising their duty of marketing new stock ought to have demanded. I have already tried to show why the forty-five dollar figure is an unsafe guide. So also is the figure indicated by market quotations. This is so for two reasons—first, because you cannot hope to dump large quantities of stock into an open market and expect to receive current prices therefor, and second, because there is no reliability to be placed in market quotations as showing true value. The case of *Hodgman v. Atlantic Refining Co., (D. C.)* 300 *F.* 590; *Id. (D. C.)* 2 *F.* (2d) 893, is cited in support of the proposition that the market value of stock is a proper criterion to accept as the price at which directors ought to issue similar stock. The case does not so hold. Market value was referred to in that case for the purpose of measuring damages and no more. That is an entirely different proposition from that with which we are here concerned. As market value cannot be accepted as a safe guide for the fixing of the sales value for unissued stock, so also neither can book value, in itself be so accepted. A study of the quoted market values of stocks and their book values will disclose strange and striking inconsistencies in their relations to each

other when the issues of various corporations are comparatively examined. We may accept the general proposition that managers of corporations ought to be required to market new issues of no par stock at prices that are fair to the corporation and existing stockholders and best calculated to yield the largest possible capital. These prices should be fixed in the light of all legitimate considerations such as appraised and sale value of assets, book values, market values of outstanding shares, present and probable earning power, market conditions, size of the issue, reputation of the corporation, and such exceptional considerations as honest and fair minded men might properly take into account. It would be hazardous to venture a cataloging of all the possible considerations which directors might take into account in fixing a price which will be fair to the corporation and its existing stockholders and best calculated to yield the largest possible capital. Whether in a given case they have fixed such price is a question which must be determined in the light of the particular conditions surrounding the transaction. Enough appears in this case to take from the transaction the appearance of unwarranted and unfair conduct which the sale of stock at the same time at two different prices would in the absence of explanation fasten upon it.

The complainants argued also that allowing the Class A common stockholders to use dividends in buying other Class A stock at twenty-five dollars a share amounts to a declaration of a dividend to them over and above the preference which the certificate of incorporation of the company allows as against the Class B common. I confess I cannot follow that argument. It seems to turn on the thought that the purchased shares can in turn be sold on the market at a profit above twenty-five dollars a share and thus the Class A common stockholder can realize out of his dividend of $1.50 a year more than that sum. The obvious answer to that is that while to be sure a profit can thus be made and the Class A stockholder obtain more than his dividend of $1.50 a year, the additional sum is not taken out of the earnings of the company. It is derived from the man to whom the stock is sold on the market. The question here is not one of dividends. It is one of capital—whether the directors are securing as much capital from the sale of

stock as they ought to secure. That question I have already discussed.

The complainants make the further point that if the directors allowed the desire to create a forty-five dollar market for 48,000 shares to influence them in offering stock to Class A common stockholders at twenty-five dollars a share, then they permitted as an element of the consideration which the company was receiving for the latter something which is neither "money paid, labor done or personal property, or real estate or. leases thereof actually acquired by the corporation," and so have admitted into the consideration for the stock something which lacks the quality of lawful consideration. This, however, appears to me to be fallacious. It is incorrect to describe this "something" as a part of the consideration. It was not a thing given by the subscriber for the twenty-five dollar stock. For that stock, twenty-five dollars and no more was the consideration given by the subscriber. This was "money paid," a lawful consideration. The other circumstance, the "something" referred to, was simply the reason and explanation for fixing the twenty-five dollar consideration in that amount.

The statute in *Section 4a* provides that when the directors have the power to issue no par stock it—

"may be issued  *  *  *  from time to time for such consideration as may be fixed from time to time by the board of directors."

I do not recall that any special emphasis was laid by the complainants at the argument on the phrase "from time to time" as of significance in the instant case. Here of course the two offerings were concurrent. In substance there was no interval of time between them. But this is of no moment. Prices at which no par stock is issued cannot be made to depend for their fairness upon the immaterial circumstances of the length of time intervening between the moments of their issuance. The phrase "from time to time" gives to the section this meaning—that no par stock may be issued at any time for such consideration as may be fixed by the directors at the time the issue is authorized.

An order will be entered discharging the present rule and vacating the outstanding restraining order. The conclusion herein reached is of course based on the present showing. What sort of

case changed or added circumstances might present in the future would have to be answered in the light of the showing then presented in event challenge should be made of the propriety of the directors' action.