WILLIAM E. ALLAUN,

*vs.*

CONSOLIDATED OIL COMPANY, a corporation of the State of Delaware, CONSOLIDATED OIL COMPANY OF TEXAS, a corporation of the State of Delaware, HENRY W. FARNUM, ROBERT HIXON, CHARLES F. GLORE, PAUL E. GARDNER, WALTER B. WOLF, WILLIAM T. KNIGHT, JANET I. BENNET, SALISBURY HUFF and HUFF OIL COMPANY, a corporation of the State of Delaware.

*New Castle, July 15, 1929.*

*Josiah Marvel*, of the firm of Marvel, Layton & Morford, and *James I. Boyce*, and *R. Randolph Hicks* and *Lauder W. Hodges*, both of New York City,. for complainant.

*Robert H. Richards* and *Caleb S. Layton*, and *Oscar D. Stern*, of Chicago, Ill., and *J. S. Clark*, of Philadelphia, Pa., for defendants.

THE CHANCELLOR. The Consolidated Oil Company, a Delaware corporation, is a holding company and will be referred to as such. Its assets consist solely of the entire outstanding stock issue of ten thousand shares of Consolidated Oil Company of Texas, a corporation of the State of Delaware. Consolidated Oil Company of Texas is an operating company and will be referred to as such. The bill charges and it is admitted that the holding company has entered into a contract with Huff Oil Company, a corporation of this State, to sell all of its assets, being the outstanding shares of the operating company's stock, to the Huff Oil Company for the consideration of fifty thousand dollars in cash less expenses of sale. The purchaser is to assume debts in the amount of seven hundred thousand dollars, making the purchase price seven hundred and fifty thousand dollars. A matter of interest charges runs the price up to something in excess of seven hundred and fifty thousand dollars, in fact, as contended by the defendants, to about eight hundred thousand dollars.

The complainant is a minority stockholder in the holding company, owning 49,908 shares of its outstanding issue of about two hundred thousand shares. How many of the authorized shares are outstanding is not stated; nor is it material to know, since the bill goes on the assumption that a sufficient number of the outstanding shares have voted for the sale to satisfy the requirements of the statute.

The bill attacks the proposed sale as in fraud of the complainant's rights because the consideration to be paid is grossly inadequate and the controlling directors who are also the majority stockholders of the selling company, have in substance entered into an agreement with the purchaser whereby they will be admitted to participate with the purchaser in the advantages of the bargain which the allegedly low priced sale affords.

The latter allegation, viz., that the majority stockholders are themselves to share with the purchaser the alleged advantages of the sale, may be disregarded, because not only do the affidavits of the complainant fail to show any facts from which the truth of the allegation can be inferred, but the affidavits filed by the defendants completely rebut the suggestion.

The complainant points out one fact which he contends

gives color to the charge of personal participation in the benefits of the sale. The fact is admitted. But it is of exceedingly slight if any value. I refer to the fact that the bankers who undertook and then abandoned the sale of an issue of stock by the purchaser to finance its needs stated in a prospectus that Knight, who is the president of both the holding company and the operating company and a large stockholder in the former, would be in charge of the purchasing company's field management of the property. Knight by his affidavit denies that he has been employed by the purchaser, admits that he is willing to be, but states that the terms of his employment, as field manager must be negotiated on a basis satisfactory to him or he would refuse to further consider the matter. It would seem that the bankers, in their prospectus, were expressing not a fact agreed upon but one that was contemplated. Granting that Knight's stock was necessary to secure a majority in favor of the sale, I yet can see nothing in the circumstances just detailed which would justify the conclusion that Knight's favorable attitude towards the sale is inspired by a vitiating motive.

Another circumstance upon which the complainant relies as showing such personal advantage accruing to members of the majority as taints their action in voting for the sale with a fraudulent motive, has to do with the defendants Farnum, Hixon and Glore, owners of fifty-five thousand shares of the holding company's stock. It appears that the complainant and Knight were prior to October, 1926, the owners of practically all the holding company's stock, each having ninety-eight thousand, five hundred shares. The company was in need of financial assistance. An agreement dated October 18, 1926, was made by the complainant and Knight with Farnum, Hixon and Glore whereby the latter agreed to loan to the operating company four hundred and fifty thousand dollars to be secured by four hundred and fifty thousand dollars of its Ten Year First Mortgage Sinking Fund Convertible Seven Per Cent. Gold Bonds, upon condition that certain representations made by the complainant and Knight were true. The complainant and Knight agreed also to deliver fifty-five thousand shares of the holding company's stock to Farnum, Hixon and Glore. A further agreement between the same parties was entered

into on November 10, 1926, by which provision was made for a temporary loan by Farnum, Hixon and Glore of four hundred and fifty thousand dollars to the operating company due in one year and evidenced by three one year notes of one hundred and fifty thousand dollars each secured by a trust indenture. A part of this second agreement provided that of the fifty-five thousand shares of the operating company's stock which the complainant and Knight were to deliver to the lenders, one-half should be returned to the complainant and Knight if and when the operating company paid its notes at their maturity on November 10, 1927. The one year loan of four hundred and fifty thousand dollars was made as agreed and the fifty-five thousand shares of stock delivered. The payment date was extended for one year to November 10, 1928. The notes are now due and unpaid. It is claimed by the defendants that the loan of four hundred and fifty thousand dollars was made before the investigation of the truth of the representations made by the complainant and Knight had been made, and that when such investigation was later made it revealed that the representations were false. Whereupon, Farnum, Hixon and Glore refused to go forward with the plan of October 18, 1926, which contemplated a ten year bond issue program. As a result of certain losses which the defendants contend the operating company suffered by reason of an unwise expenditure of a large portion of its borrowed funds, dissensions arose between the complainant and Knight, and the former's connection with the company was severed except as a director. In May, 1927, the operating company obtained a loan of fifty thousand dollars from a Chicago bank through the efforts of Farnum, Hixon and Glore, giving therefor its note secured by the endorsements of Farnum, Hixon and Glore along with the complainant and Knight. This note is unpaid.

If the sale of the assets goes forward to completion, the purchaser will assume the obligation of paying the notes as well as all other debts of the operating company. Presumably of course the four hundred and fifty thousand dollars of notes held by Farnum, Hixon and Glore and the fifty thousand dollar note endorsed by them with others will be duly paid. Thus, argues the complainant, Farnum, Hixon and Glore stand to be benefited

by the sale. The notes they hold will be paid as well as the note on which they are endorsers. Inasmuch as Farnum, Hixon and Glore are said to be the dominating and controlling factors in committing the corporation to a sale, it is argued that the personal advantage which they thus will derive is of such character as would warrant a court of equity in restraining the use of their controlling power in order to effectuate its enjoyment.

In considering this argument, the first observation to be made is that the bill does not assume to base the case in any of its aspects upon it. The fraud charged by the bill consists solely in the proposed acceptance of a grossly inadequate price and in the fact that the controlling majority is to be a sharer in the advantageous bargain.

Laying aside, however, any question of pleading, the argument in point of merit does not appeal to me as tenable. From the viewpoint of not only the corporation owning the assets but as well from the viewpoint of its stockholders, debts are debts that must be paid when due, no matter to whom they are owed. Messrs. Farnum, Hixon and Glore are in a position as unpaid creditors of being able to enforce payment by foreclosure or, the condition of the debtor company shows, by receivership proceedings, if not bankruptcy. They are entitled to be paid the over-due notes held by themselves and to have the note on which their names appear as endorsers paid in due course. If instead of collecting their claims by enforced liquidation they choose to exert the voting power which they are said to control in order to liquidate through a negotiated sale whereby all claims including their own will be taken care of, I can see nothing unfair or fraudulent in the transaction, provided of course the price to be obtained is fair and adequate. As observed by this court in *Allied Chemical & Dye Corp. v. Steel & Tube Co.*, 14 *Del. Ch.* 11, 120 *A.* 486, it is the right of the majority in a corporation to practically desert the corporate venture by selling out its assets and, thereby, in the case of a highly profitable concern, deprive their associates of the opportunity to reap gains in the future by continuing in the business, provided the terms and conditions of the sale are fair to the corporation. I suppose, however, if the sale is only a "freezing out" one by which the majority use their

power to· sell to themselves in another guise and thereby carry on in the business without their former associates of the minority, equity would doubtless restrain it regardless of the fairness of price. *Theis v. Spokane Falls Gas Light Co., et al.*, 34 *Wash.* 23, 74 *P.* 1004; *Kavanaugh v. Kavanaugh Knitting ·Co.*, 226 *N. Y.* 185, 123 *N. E.* 148. That, however, is not this case. The phase of the case we are now considering is whether or not stockholders who happen also to be over-due creditors may be inhibited from using their voting power in favor of a fair sale where the only claim of tainting fraud is that their debts as well as others will result in being paid. If the ensuing of that sort of result can properly be called a personal advantage, it is not such a personal advantage as could in reason be regarded as indicating a fraud.

Another personal advantage which the complainant contends Farnum, Hixon and Glore will derive from effectuating the sale consists in this—that if the sale is made Farnum, Hixon and Glore will be relieved of their obligation evidenced by the contract of October 18, 1926, to extend a ten year credit for the four hundred and fifty thousand dollars loaned by them to the operating company. Farnum, Hixon and Glore in reply to this contention insist that their agreement of October 18, 1926, was not with the holding company but with the individuals Knight and Allaun, and that, even assuming a breach thereof, neither the holding company, nor its subsidiary, the operating company, have any standing to complain about it; and, even if the holding company or the operating company were ·parties to the contract and so in a position to demand its advantages, yet the obligation to take ten year bonds was conditioned on the truthfulness of certain representations, which representations were in fact untrue, and as a consequence Farnum, Hixon and Glore became relieved of the obligation to take the ten year bonds. Both branches of this reply are well grounded, the former as a matter of law and the latter by the weight of the evidence.

I fail, therefore, to find anything in the way of personal advantage which can have the result of attributing fraud to those who are proposing to effectuate the sale.

But the majority favoring the sale owe something more to the minority than to merely refrain from reaping a forbidden

personal advantage, either directly or indirectly, from the sale. They owe the further duty of seeing to it that the assets shall be sold for a fair and adequate price. *Allied Chemical & Dye Corp. v. Steel & Tube Co., supra;* see also, *Bodell v. General Gas & Electric Corp.,* 15 *Del. Ch.* 119, 132 *A.* 442.

It is then next in order to inquire whether or not the price which the majority have decided to accept is a fair and adequate one. The answer to this question invites a study of the value which the assets may be fairly said to possess, and, having ascertained the value, a determination of the question of whether or not there is such a disparity between the price to be received and the value found as would indicate legal fraud upon the rights of the dissenting minority. It is not every disparity between price and value that will be allowed to upset a proposed sale. The disparity must be sufficiently great to indicate that it arises not so much from an honest mistake in judgment concerning the value of the assets, as from either improper motives underlying the judgment of those in whom the right to judge is vested or a reckless indifference to or a deliberate disregard of the interests of the whole body of stockholders including of course the minority. In substance this principle is deducible from cases heretofore decided by this court. *Allied Chemical & Dye Corp. v. Steel & Tube Co.,* 14 *Del. Ch.* 64, 122 *A.* 142; *Robinson v. Pittsburgh Oil Refining Corp.,* 14 *Del. Ch.* 193, 126 *A.* 46. The judgment of the directors in fixing the terms and conditions of the sale is entitled to the presumption in its favor that it was exercised honestly and in good faith. *Robinson v. Pittsburgh Oil Refining Co., supra.* The evidence must disclose facts upon which to base a conclusion adverse to that of the responsible spokesmen for the corporation, before the court would be justified in withholding from their judgment the benefit of that presumption of good faith and fairness which the law accords to it.

Referring to the evidence, it does not seem necessary to discuss it in its voluminous details. It concerns the value of the holding company's assets which consist entirely of ten thousand shares of stock of the operating company. The evidence therefore is directed to the value of the net assets of the operating company.

On the side of the complainant affidavits are filed which

consist of a bare statement of the opinions of the various affiants that the holding company's assets have a conservative value of about one million, five hundred thousand dollars. Opinions, where facts and considerations are not given upon which such opinions are based, are not of great assistance in an endeavor to arrive at the value of such assets as these, especially where opinions from equally reliable sources are placed in opposition. See *Allied Chemical & Dye Corp. v. Steel & Tube Co.*, 14 *Del. Ch.* 64, 122 *A.* 142.

For the most part, the evidence of the complainant consists of mere opinions without the foundation of facts and considerations suggested thereby upon which the opinions are based. The defendants have adduced opinions of a similar nature from affiants of at least equal competency to speak.

As observed in the *Steel & Tube Co. Case* (14 *Del. Ch.* 64, 122 *A.* 142), in cases of this kind while the question is one of value, it is of value in connection with a sale. That is to say, the question is, what is the value for sale purposes? It is manifest that selling value may be more or less than actual value. In the *Steel & Tube Co. Case*, *supra*, I took occasion to remark upon various considerations that must be taken into account as affecting value for sale purposes in contradistinction to values for other purposes. Those considerations will not be again adverted to here.

When it is remembered that we are here concerned with value for sale purposes, I am particularly impressed by the significance of a certain class of evidence which the defendants have produced. It seems that these assets have been for sale for some time. Negotiations were had with various possible purchasers which resulted in an appraisement by the latter for the purpose of possible purchase. These appraisements were made for Superior Oil Corporation, Venezulean-Mexican Oil Corporation, Phillips Petroleum Company and Dixie Oil Company, a subsidiary of one of the Standard Oil Companies. It is hardly conceivable that appraisements made on behalf of these companies which were in the market for desirable properties, were unintelligently made. To be sure the companies referred to were contemplating a purchase of the assets and hence doubtless

fixed their figures with an eye to a possible profit to be realized from the development thereof. Where a seller desires to sell, however, as did the holding company in this case, the fairness of a selling price must, as pointed out in the *Steel & Tube Case*, be in part determined by the proposed purchaser's opportunity for profit. That fact is inherent in the situation. If a price that will yield the purchaser a reasonable profit will from that circumstance alone demonstrate unfairness in its figure, it is manifest that as a practical proposition sales by corporations of their entire assets, though authorized by the statute, will except in the most unusual cases be incapable of consummation, for clearly a sale connotes the idea in the purchaser's mind that a profit is obtainable. In view of what has just been said, therefore, the fact that the appraisements made by the companies referred to were made in the belief doubtless that if a purchase could be made at the figures shown by the respective appraisements a profit could be eventually realized, can be of no special significance in determining what would be a fair sales price to be received for the properties.

The companies referred to appraised the assets as follows: Superior Oil Company, $608,000; Venezulean-Mexican Oil Corporation, $666,000; Phillips Petroleum Company, $370,476 (not including rigs, automobiles, etc.); and Dixie Oil Company, $750,000. It will thus be seen that the price to be received from the Huff Oil Company is equal to the highest figure set by any of the companies named, and if over-due interest is to be taken into account is higher by several thousand dollars—by about fifty thousand dollars in fact, according to one affiant.

The complainant refers to the appraisement by Dunlap made for the purchasing company. Dunlap advised the purchase by the Huff Oil Company at eight hundred thousand dollars, and stated that in his judgment the properties were worth $1,414,193. With respect to Dunlap's appraisement two things are to be noted which take from his figure of $1,414,193 the significance which it might otherwise have. These are first, that his valuation of $1,414,193 was predicated on the condition that "ample money for development and operating purposes" be supplied, a condition which the evidence shows neither the holding nor the operating company could fulfill. Both of these com-

panies were in the financial doldrums, so to speak, having apparently exhausted all their sources of credit and a sale to some one seemed imperative. Under such circumstances, even assuming the Dunlap figure of value was a reliable one, some concession in price was not unreasonable. In view, however, of the much lower valuations placed by other possible purchasers, it is difficult to see how the controlling majority could be said to display a lack of good judgment in not accepting Dunlap's figure even if they had known of it. From the field of possible purchasers they took the best offer. Even though their own opinions as to the value may have been as high as Dunlap's, which the evidence shows not to be true, yet, the sale being determined upon, it would seem that the price agreed upon makes a very creditable showing in the light of the market for the properties which offers from others revealed. And second, with respect to Dunlap's. valuation, I cannot escape the conclusion that his appraisal was made with an eye to the public which was to be invited to participate in the financing of the purchase through an offering of stock by the purchasing company. The prospectus which appears to have been prepared in advance of the signing of the contract of purchase, containing a description of the properties of the offering company, states the exact figure of $1,414,193 as Dunlap's valuation of the properties. It needs no argument to convince any one that a value on the basis of which a thing is hoped by the purchaser to be sold for to the public, however great may be the honesty in which the purchaser's hope is founded, is not a safe criterion to accept as the test by which the wisdom of the seller is to be appraised in the fixing of the fair price he ought to be willing to take.

As bearing on the question of value, the complainant's affidavit states that Knight offered the complainant seventy-five thousand dollars for his stock in November, 1928, and later in 1928 offered him one hundred and thirty-four thousand dollars. Knight denies ever offering as much as one hundred and thirty-four thousand dollars, but admits that in the fall of 1928 he did offer the complainant seventy-five thousand dollars for his stock. At the same time he testifies that he offered to sell his own stock, equal in amount to the complainant's for twenty-five thousand dollars.

It is apparent that whatever took place between the two associates, Knight and the complainant, in the way of offers to buy or sell was occasioned by the disagreements that had arisen between them and the desire of Knight to terminate their further association together in the enterprise. The worth of any testimony concerning the selling price of shares of stock as a safe reflection of the net value of the corporate assets underlying the stock is of extreme dubiousness. This was pointed out in *Allied Chemical & Dye Corp. v. Steel & Tube Co.*, 14 *Del. Ch.* 1, 120 *A.* 486. See also *Bodell v. General Gas & Electric Co.*, *supra*. Too many adventitious circumstances having no connection with ultimate underlying values are apt to enter into the sale and .purchase of stock to allow much weight to be given to the sale price of stock as a reflection of the sales value of the assets represented by it. Whatever may be the truth, then, concerning the offer of Knight to buy the complainant's stock can be of little if any assistance in the present connection.

Emphasis is laid upon the fact that after the sale had been negotiated but on the eve before the contract was actually executed, a new well known as Waggoner "O" had been drilled into the sand which ought to have added considerable to the property's value. The testimony shows that on previous occasions wells had been drilled into oil bearing sand on this company's property which, though they looked valuable at first, proved comparatively worthless. Again the operating company had only a five-sixteenths interest in the Waggoner "O" lease which was subject to a three-eighths royalty to the owner, with a right in the owner to exercise the option of taking all the oil produced if desired at the posted price. The latter circumstance obviously detracts from the value of Waggoner "O" in the eyes of a purchaser who himself is seeking a supply of oil. I cannot persuade myself that the directors displayed bad not to say unfair judgment in refusing to consider that the drilling of Waggoner "O" into the sand added enough of value to the properties to make the price agreed upon so unfair or inadequate as to halt the proposed sale.

On the evidence before me I conclude therefore that its weight, if it does not actually support, at least fails to overcome the presumption which exists in favor of the fairness of the price

which the responsible authorities in the selling company have determined upon.

There are two other matters that call for attention before this opinion is concluded.

The complainant points out what he designates as secrecy and haste in connection with the negotiations for the sale as a badge of fraud which, in connection with all the other circumstances before referred to, indicate that unfairness lies at the bottom of the transaction. The only haste that is at all evident appears to be such haste as any one in embarrassed circumstances indulges in who thinks he sees a favorable opportunity to escape from his difficulties. As to the alleged secrecy—the complainant, I conclude from the evidence, was never in the dark.

The second matter that was urged at the argument and which I feel called upon finally to notice is the contention that fifty-five thousand shares of stock held by Farnum, Hixon and Glore were unlawfully voted in favor of the sale. Whatever might be the true merits of this contention (which I may say in passing is of doubtful value), it is enough to say that the bill no where challenges the regularity of the corporate proceedings by which the sale was authorized. It assumes that everything was regularly authorized. Its sole attack is based on the unfairness of the price and the personal interests of the controlling faction. The defendants are not called upon by the bill to defend the voting of the fifty-five thousand shares referred to. Consideration of the contention on its merits is therefore not permissible.

The rule for preliminary injunction will be discharged and the restraining order vacated.

Order accordingly.