AIDA ABELOW, ET AL.,
Plaintiffs,

*vs.*

GARDNER SYMONDS, MIDSTATES OIL CORPORATION, a Delaware corporation, MIDDLE STATES PETROLEUM CORPORATION, a Delaware corporation, TENNESSEE GAS TRANSMISSION COMPANY, a Delaware corporation, et al.,
Defendants.

*New Castle, July 28, 1961.*

*Daniel O. Hastings* and *Russell J. Willard, Jr.,* of Hastings, Lynch & Taylor, Wilmington, for plaintiffs.

*Henry M. Canby* and *E. Norman Veasey,* of Richards, Layton & Finger, Wilmington, for corporate defendants.

MARVEL, Vice Chancellor: Aida Abelow and Helen G. Hamburg as stockholders of Midstates Oil Corporation instituted this suit on December 29, 1958 for the purpose of enjoining a proposed sale of all of the assets of such corporation to its parent corporation, Middle States Petroleum Corporation, pursuant to a contract which by its terms was to be consummated on or before January 1, 1959. While a motion for an order restraining the consummation of such proposed sale was denied on December 29, 1958, a hortatory rule simultaneously issued directing Midstates to show cause why consummation of the proposed sale should not be enjoined. However, the interested parties defendant proceeded as planned, and after the sale was carried through the net assets of Midstates reduced to cash were speedily made available to its stockholders including plaintiffs.

Thereafter the case was dismissed inasmuch as the sole relief originally sought by plaintiffs had been the enjoining of a transaction which had since been consummated. Leave to amend having been reasonably sought, plaintiffs were granted a limited time for taking appropriate action under *Rule* 15, *Del.C.Ann.* and thereafter prepared and filed several motions to which were attached proposed amendatory and supplemental pleadings in which additional parties plaintiff were named. Plaintiffs' case as redesigned in their revised pleadings was no longer conceived of as a derivative suit brought for the benefit of their corporation but rather as an action of individual stockholders to recover personal money judgments for themselves and other members of their class, *Lebold v. Inland Steel Co.,* 7 *Cir.,* 125 *F.2d* 369. Their motions were granted after argument, and in conformity with the Court's opinion of November 25, 1959, 38 *Del.Ch.* 572, 156 *A.2d* 416, an order was entered on January 13, 1960 granting leave to plaintiffs to file their proposed amendments and supplements to the original complaint.

Midstates and Tennessee Gas Transmission Company thereupon filed their answers. Midstates denied plaintiffs' broad allegation that the boards of Midstates' and Middle States were made up

of the same or interlocking directors at any time from 1930 until Midstates' dissolution but conceded that one, and at times, two directors served on both boards. It also admitted that at the time of Midstates' dissolution there were outstanding 22,175.6525 shares of its common stock of which 21,270.685 shares or approximately 95.93% were owned by Middle States, leaving outstanding in the hands of others 904.9675 shares or approximately 4.07% of its shares outstanding. Midstates also admitted that Middle States had on December 5, 1958 offered to buy the assets and properties of Midstates and that on June 20, 1958, Tennessee Gas had offered to exchange 1,084,054 shares of its own stock for the then outstanding shares of Middle States, said stock having at that time a market value of $30,859,539. It was further admitted that as a result of this latter proposal Tennessee Gas stock was exchanged for approximately 93% of the outstanding shares of Middle States, a percentage which by August 8, 1958 had resulted in 95.75% of the stock of Middle States being deposited with Tennessee Gas. These allegations were also set forth in the answer of the latter corporation filed the same date, and the case moved into the pre-trial discovery stage.

On August 18, 1960, plaintiffs moved for summary judgment, supporting such motion with an affidavit of one of their counsel, Daniel O. Hastings, to which were attached numerous exhibits. Countering such motion, the corporate defendants also moved for summary judgment, a motion which they in turn supported with a number of counter affidavits. Briefs having been thereafter filed and argument had, such opposing motions for summary judgment are now before the court for decision.

While plaintiffs concede that § 271, *Title* 8 *Del.Ch.* permits a Delaware corporation to sell its assets in a proper case, they contend that in the transaction here under attack they and others of their class have not received an adequate sum of money for their shares in liquidation, having suffered such injury as a result of actionable breaches of fiduciary duty on the part of directors common to the boards of Middle States and Midstates as well as on the part of the stockholder in control of Midstates, namely Middle States, which at the time of the sale owned 95.93% of the corporate stock of Mid-

states.  Plaintiffs argue that the directors of each such corporation, who though named as parties to this suit have not appeared, as well as Middle States as the controlling stockholder of Midstates owed a high degree of fiduciary duty to plaintiffs and their class not to profit at the expense of plaintiffs and other minority stockholders of Midstates in the transaction under attack, and accordingly the Court must scrutinize such transactions with great care.  Plaintiffs insist that as a result of the disregard of the rights of the minority stockholders of Midstates by those in control of the transactions under attack the assets of such corporation were unfairly acquired by Middle States for the benefit of Tennessee Gas.  They claim that the record discloses that plaintiffs and others of their class have not received what they are clearly entitled to, namely amounts in liquidation equivalent to what the stockholders of Middle States received in the overall transaction which culminated in the merger of Middle States into Tennessee Gas Transmission Company.  Plaintiffs claim this deficiency in payment to be the sum of $733.36 per share, pointing out that the unfairness of the treatment accorded them and their class is demonstrated by a cursory consideration of the price indirectly placed by Tennessee Gas Transmission Company on the assets of Midstates at the time a purchaser for such assets was being sought in the summer of 1958.  In conclusion, plaintiffs contend that in the final analysis Tennessee Gas through its subsidiary, Middle States, owed the same type of fiduciary duty to plaintiffs and members of their class as was owed to them by Middle States.

The appearing defendants reply that while the price for the Middle States shares set in the exchange transaction is irrelevant to plaintiffs' claims, the same ratio applied to a hypothetical contemporaneous exchange of the shares of Tennessee Gas and Midstates would have netted the stockholders of Midstates less than they actually received on their corporation's liquidation.  They further contend that the only way in which Tennessee Gas could be successfully charged with having improperly benefited itself through its instrumentality, Middle States, would have been to have caused such corporation to pay less for the assets of Midstates than they were worth, a result which such defendants contend

was carefully avoided. They submit that the data introduced by them in affidavit form discloses that on December 9, 1958, the date of the actual contract governing the basic transaction under attack, the book value of plaintiffs' stock was $802 per share, that the going concern value per share was then $913 per share, the market value per share was $1,065.00 and the asset value per share based on the Harrison appraisal was $1,123.76. According to the corporate defendants, plaintiffs have offered no probative data to the contrary, allegedly resting their case on epithets and the unfounded assertion that they are entitled to an amount computed on the theory that the offer to exchange stock of Tennessee for that of Middle States must be considered to be the equivalent of a firm bid for the assets of Midstates. It is argued that the two separate transactions which preceded the dissolution of Midstates can't be equated, stock valuation being essentially foreign to asset valuation or going concern valuation and that even if the values involved in the two transactions could be fairly equated, Middle States had property other than the stock of its subsidiary which Tennessee wished to acquire. It is also pointed out that the arrangement whereby the stock of Tennessee Gas and Middle States was exchanged avoided the expenses of an underwriting and the market hazards which would have been faced had the device of a stock issue been employed rather than that of an exchange. It is finally urged that the Middle States offer for the assets of Midstates was based on values fixed in the so-called independent Harrison appraisal, hereinafter referred to, which allegedly corrected overestimates of reserves found in the earlier Kravis report which had been made at the request of Midstates. The appearing defendants conclude that plaintiffs merely differ with the judgment of the individuals responsible for the steps which resulted in the dissolution of their corporation and that absent fraud or a showing that the amount received for their corporation's assets was grossly disproportionate to their value, plaintiffs have no standing under Delaware law to demand that they be paid more than the amounts already paid to them following the liquidation of Midstates.

Turning now to the complicated corporate changes here involved, it is alleged by the corporate defendants that they had their genesis

in discussions designed to arrive at a plan for counteracting a declining profit trend in the business of Middle States. The directors of Middle States preliminarily decided in 1957 to dispose of certain assets of Midstates in order to raise needed cash. This having been accomplished, a more critical remedial step was decided on in the spring of 1958, namely a plan either to sell the assets of Middle States or to cause such corporation to enter into a merger agreement. The services of Dillon, Read & Co., Inc., were engaged to seek out appropriate opportunities and to make recommendations and a number of offers were received, the most attractive in the opinion of the Middle States directors being that of Tennessee Gas to trade its stock for that of Middle States on the basis of .45 to 1. A tender ensued, and by July 30, 1958 Tennessee Gas had acquired 93% of the stock of Middle States and had installed directors of its choice on the board of the latter corporation as well as on the board of Midstates with the avowed purpose in mind of ultimately dissolving or otherwise absorbing the assets of both Midstates and Middle States.

Meanwhile the directors of Middle States decided to offer to purchase the assets of Midstates and the services of the firm of Robert W. Harrison and Co. were engaged to make an appraisal of the latter's assets. On the basis of the value set in such appraisal Middle States offered to purchase the assets of Midstates for the sum of $24,970,000 and to assume the liabilities of such company. Such offer was accepted and thereafter approved by the stockholders of Midstates. At the time of such acceptance and approval not only had a complete slate of directors of the selling and buying corporations been put into office by Tennessee Gas but the buying corporation was also the owner of almost 96% of the selling corporation's stock. However, Middle States and Tennesseee Gas were independent of each other at the time of the earlier exchange of stock between them and the exchange was clearly one between individual stockholders. To be sure, such action on the part of the stockholders of Middle States was taken on the recommendation of their corporate president, nonetheless it was, as just noted, a transaction between individual stockholders and not between the corporations as such. The final step in the emergence of Tennessee Gas as the

sole proprietor of what remains of the assets of either Middle States or Midstates and the disappearance of Middle States as a corporate entity occurred in mid-summer 1959 when it was merged into Tennessee Gas.

The basic questions to be decided are whether or not plaintiffs have been actionably injured, and if so at whose hands. The immediate question to be decided is whether or not the issue of alleged liability can be appropriately decided on the pending motions. In dealing with these questions I shall pass over plaintiffs' contentions about lines of fiduciary duty stemming from Tennessee Gas's controlling position and turn preliminarily to the data of record which is concerned with the value of the assets of Midstates at the time of their sale because if such assets are found after careful scrutiny to have been sold for a proper amount under Delaware law, plaintiffs would appear to have no cause to complain.

The basic position of the corporate defendants is that under Delaware law a sale of assets under § 271, *Title* 8, *Del.Ch.* will withstand any stockholder objection if it is made for a fair and adequate price, *Allied Chemical & Dye Corporation v. Steel & Tube Co.,* 14 *Del.Ch.* 1, 120 *A*. 486. Defendants contend that the price offered for the assets of Midstates, while based in part on a study of accounting data prepared by Arthur Anderson & Co., was basically derived from an independent survey made by Robert W. Harrison, a well-known and respected expert in appraising oil and gas properties. It is pointed out that whereas in the case of most industrial operations the customary method of appraising assets emphasizes capitalization of earnings, in the petroleum industry valuation is customarily arrived at in large part by placing a dollar value on estimated reserves of oil and gas. According to his affidavit, Mr. Harrison made individual appraisals of Midstates' twenty-four major fields, a project which allegedly required eighty-five man days to complete, and accepted the Kravis figures as to scattered leasehold interests after adjusting them to September 30, 1958.

After reducing the present appraised worth of future net income of the properties by twenty-five to thirty per cent in order to

arrive at the fair market value of the reserves in question, he fixed such value as of September 30, 1958 at $24,000,000. Inasmuch as no request had been made to appraise undeveloped leaseholds of Midstates, such properties were listed at book value, such being the ordinary method of evaluating underdeveloped leasehold and royalty interests. A salvage value was also given to well and lease equipment employed by Midstates in its business.

Defendants argue, as noted earlier, that plaintiffs rather than directly attacking the objectivity and fairness of the Harrison report stress the cursory nature of the information given to the stockholders of Midstates of the proposed sale, the precipitate acceptance of the $24,947,610 offer by the directors of Midstates, and the fact that at the time of the offer, which was formally tendered on December 5, 1958, Tennessee Gas had installed directors of its choice on the boards of both the buyer and seller. Indirectly the sale's figure is brought under heavy attack by comparing it with two other offers allegedly made for the assets of Midstates either of which, according to plaintiffs, if accepted would have netted more for the Midstates stockholders than was paid them in the transaction under attack. Their principal contention is that one of these offers, namely the Tennessee Gas Transmission exchange proposal, when translated into a fair price for the stock of Midstates, clearly discloses that in May of 1958 Tennessee Gas itself placed a substantially higher price on the assets of Midstates than it caused to be offered for them in December of the same year. It is argued, of course, that there has been no showing that there was any appreciable change in the value of the assets of Midstates during the intervening months.

The difficulty with this contention is that an offer to exchange stock with the stockholders of an independent corporation is not the same thing as an offer to buy the assets of such corporation's subsidiary after consummation of the exchange. More specifically it has been stated by this Court that:

"The worth of any testimony concerning the selling price of shares of stock as a safe reflection of the net value of the corporate assets underlying the stock is of extreme dubiousness.

This was pointed out in *Allied Chemical & Dye Corp. v. Steel & Tube Co.,* 14 *Del.Ch.* 1, 120 *A.* 486. See also *Bodell v. General Gas & Electric Co., supra* [15 *Del.Ch.* 119, 132 *A.* 442]." *Allaun v. Consolidated Oil Co.,* 16 *Del.Ch.* 318, 147 *A.* 257, 262.

■ However, it is also settled law in Delaware that when the price to be paid in a sale of corporate assets case is under attack, the question to be decided is what is the value of such assets for sale purposes, selling value having the quality, according to the circumstances of the particular transaction, of being more or less than actual value. While the Harrison affidavit is impressive, it is a professional opinion and no more, the only practical evidence of negotiations between a willing "buyer" and "seller" being those concerned with the stock of Middle States which the corporate defendants say throw no relevant light on the value of Midstates' assets in December 1958. The appearing defendants go on to point out that in the case of *Gropper v. North Central Texas Oil Company,* 35 *Del.Ch.* 198, 114 *A.2d* 231, the Court relied in large part on expert appraisal data in declining to enjoin a proposed sale of assets. However, ·the sale here under attack has long since been consummated and the case is in a final hearing posture. In view of what appears to me to be a *bona fide* dispute as to value, which I feel cannot be finally resolved on the present record, I shall adopt the procedure followed by the Chancellor after he preliminarily enjoined a proposed sale of assets in *Allied Chemical & Dye Corp. v. Steel & Tube Co., supra.* Thereafter he caused testimony to be taken on the issue of whether or not the price to be paid was fair and adequate. I propose to adopt a similar course of procedure, and after a conference with counsel shall set a hearing on the issue of the price herein paid. Claims made by plaintiffs as to what was a fair value for the Midstates assets, insofar as they are subject to being properly established in an action such as this, would, of course, be a matter for consideration at such hearing.

■ In short, unless the corporate defendants can prevail on some theory of ratification or waiver, I see no way other than a trial examination of the evidence to reach a determination of whether or not the price paid for the assets of Midstates can withstand plain-

tiffs' attack. Such price will be judged in the light of the peculiar facts of self-dealing inherent in the transaction and the presumptions flowing therefrom. To be sure summary judgment was granted in an analogous purchase of assets situation in *Lewis v. Hat Corporation of America, Del.Ch.,* 150 *A.2d* 750, but there the facts on valuation were simple and not seriously challenged.

As to alleged ratification, I am not satisfied that the vote of 302.108 minority shares of Midstates in favor of the sale was on the present record effective, knowledgeable ratification under Delaware law. Finally, the receipt and retention by plaintiffs and others of their class of the liquidating dividends tendered on the dissolution of Midstates does not estop them from suing for the difference between the tendered dividends and what they claim they should have received had the assets of Midstates been sold for a fair and adequate price. See *Opinion* in this case of November 25, 1959, 38 *Del.Ch.* 572, 156 *A.2d* 416 and *Lebold v. Inland Steel Co., supra.*

On notice an order may be submitted denying the pending motions for summary judgment.